## SEAWELL v. CAROLINA CENTRAL RAILROAD COMPANY.

(Filed November 24, 1903.)

EVIDENCE—*Res Gestae—Carriers—Passengers—Assault.*

> In an action against a carrier for failure to protect a passenger against an assault at a station, the evidence by a witness that he told the person assaulted immediately after the assault that an employee of the carrier took part in the assault is competent as part of the *res gestae.*

CONNOR and WALKER, JJ., concurring.

A PETITION TO REHEAR this case, reported in 132 N. C., 856.

*J. D. Shaw, W. H. Day* and *Shepherd & Shepherd,* for the petitioner.

*J. D. McIver, W. J. Adams, R. L. Burns, Douglass & Simms, G. W. McNeill, G. H. Humber* and *U. L. Spence,* in opposition.

CLARK, C. J. This is a petition to rehear our opinion in this case, 132 N. C., 856. The chief exception relied on is the refusal of the Judge to non-suit the plaintiff, on the ground that there was no evidence. The plaintiff, who was a candidate for Lieutenant-Governor of this State, had gone

in his canvass of the State to speak at a town where the party whose candidate he was was unpopular. He went back to the railroad station to take the train, and while at the station, with a mileage ticket in his pocket, awaiting the arrival of the train, a mob came up and threw eggs at him, striking him with them in the face, on the head and other parts of his person, and at the same time using insulting, indecent and opprobious remarks. The defendant had three employees present, Ramsour, Carroll and Wells, and it is not contended that either of them gave the plaintiff the slightest protection or assistance, and it is further clear that even when the train arrived the conductor gave him no protection, but evaded doing so by going back on the train and through the cars to reach the front end of the train to communicate with the local agent. There was evidence tending to show that not only no protection was afforded or attempted by any of the defendant's employees, but that Carroll and Ramsour encouraged the assault, Carroll engaging with the mob (which had come out of the railroad office with Ramsour) in throwing eggs and joining in the cries of the mob, and Ramsour saying they "had not egged him half enough" after the first eggs were thrown.

The Constitution and laws of this State guarantee freedom of speech, and nothing could be more unmanly than a mob assailing one man in such manner for his difference from them in his political opinion. No right-thinking man, here or elsewhere, will express other opinion of the proceeding, and the most that can be said is that it was the act of a mob, for which the community was not responsible. The plaintiff was an invited guest of the defendant and on its premises, a passenger, who, at the invitation of the defendant, had bought a mileage ticket over its road and had gone to the station to take its train. The defendant was a *quasi* public corporation, forbidden to make any discrimination in the discharge of its

duties to the public other than as provided by the power from
whom it holds its franchise, to exist and operate its road.   It
owed to the plaintiff the same protection and courteous treat-
ment it owed to every other passenger.   It could not extend
this protection otherwise than through its agents and em-
ployees.   Of the four employees present—Ramsour, Carroll,
Wells and the conductor—not one is shown to have made the
slightest attempt to protect the plaintiff, and there is evi-
dence that two of them actively participated in, or, at least,
encouraged the assault.

A careful examination of all the authorities shows no case,
and the appellants cite none, in which, under similar circum-
stances, the railroad company has not been held liable, unless
it exerted what power it could to protect the passenger from
the mob.   Here, if the agent had taken the passenger into his
private office, or offered to do so, had expostulated with the
mob, and on the arrival of the train, in company with the
conductor and his own employees escorted him to the train,
the eggs would hardly have been thrown, and at any rate
the defendant would not have incurred liability for this breach
of duty.   Or there might have been other attempts to protect
the passenger while on its premises, and which the jury might
have held sufficient.   But here there was none whatever.   It
was the assaulting mob, not the passenger, whom the agent
admitted to his office, and he issued therefrom with the mob
at his heels, who immediately began spattering the plaintiff
with eggs and abuse.   Such attempted intimidation for politi-
cal opinion's sake cannot be safely permitted, especially by
great public corporations holding their franchises in trust,
impartially, for all the public.

The cases are uniform, fastening liability upon a common
carrier for failure to extend such protection, as it can, to a
passenger against a mob.   No one before has questioned that
the corporation would be liable when its own agents actively

encouraged or participated in the assault by the mob. The law has never been more clearly and accurately stated than by *Mr. Justice Ruffin* in *Britton v. Railroad,* 88 N. C., at p. 544; 43 Am. Rep., 749, where the plaintiff was a colored passenger. Said *Judge Ruffin:* "The carrier owes to the passenger the duty of protecting him from the violence and assaults of his fellow-passengers or intruders, and will be held responsible for his own or his servant's neglect in this particular, when by the exercise of proper care the acts of violence might have been foreseen and prevented; and while not *required to furnish* a police sufficient to overcome *all force,* when unexpectedly and suddenly offered, it is his duty to provide ready help sufficient to protect the passenger against assaults from *every quarter* which might reasonably be expected to occur under the circumstances of the case and the condition of the parties." For this he cited several authorities. Many others to like purport, but later, were cited by us in our former opinion, 132 N. C., at p. 859. Among the numerous additional cases are *Railroad v. Jefferson,* 89 Ga., 554; 17 L. R. A., 571; 32 Am. St. Rep., 87; *Railroad v. Burke,* 53 Miss., 200; 24 Am. Rep., 689; *Spohn v. Railroad,* 87 Mo., 74; *Railroad v. Pillsbury,* 123 Ill., 9; 5 Am. St. Rep., 545; *Railroad v. Hinds,* 53 Pa. St., 512; 91 Am. Dec., 224; *Krantz v. Railroad,* 12 Utah, 104; 30 L. R. A., 297; 1 Thompson Neg., sec. 968, and many other cases where the liability was for omission to make reasonable efforts to protect the passenger from assaults by other passengers or by a mob. There is not, and could not be, any authority holding a common carrier irresponsible when its agents participated in or encouraged the assault. The station and cars of a railroad are *quasi* public, where every one who pays his fare has a right to be, and if such corporations, permeating everywhere as they do, can, with impunity, through its employees, assault or permit assaults on its passengers for the political opinions enter-

tained by them (as in this case), or for any other reason, the result would be deplorable in the extreme.

Only one other point requires notice, and that only because it was pressed with great zeal on the argument. A witness (McBryde) having testified to evidence tending to show that he saw Carroll, one of the defendant's employees, throw an egg at the plaintiff, further stated, under objection, that he hollered and told the plaintiff, in the presence of the crowd, "just right afterwards." On cross-examination McBryde said it was "a minute afterwards." This was not excepted to, nor was his statement thereupon, that he told Seawell that he saw the man throw the egg, excepted to. If it had been, the first statement of the time may, nevertheless, have been more correct. In such circumstances the passage of time cannot be very accurately measured. But had the evidence been duly excepted to, it was properly received, not only as corroborative evidence, but as substantive testimony, as a part of the res gestæ. Harrill v. Railroad, 132 N. C., at p. 659; Bumgardner v. Railroad, Ibid., 438. The egg-throwing was not over, for McBryde said he told the plaintiff after Carroll threw the first egg, that the plaintiff shook his cane at Carroll, and thereafter he saw Carroll throw another egg; but if the egg-throwing had been over the abuse and insults were not, for even as the train rolled off, carrying the plaintiff, the crowd was jeering the plaintiff, the station agent and Wells and Carroll were all laughing at his pitiful plight, and one of the crowd yelled after him, "Put that suck-egg dog off at Buffalo and let him wash himself." The statement of McBryde to the plaintiff was made before the train had started to move, and he says Carroll threw another egg at the plaintiff, just as it started. The exclamations of third parties present are as much a part of the res gestæ as those of the parties themselves. State v. McCourry, 128 N. C., 598; Harrill v. Railroad, supra.

Even if the exception had been duly taken and the evidence

had been erroneously admitted, yet if it had been rejected there was sufficient evidence to refuse the non-suit, which is the point now before us, in view of the fact that the defendant's station agent admitted in his testimony that no steps whatever were taken to give the plaintiff any protection, and the evidence tending to show that the railroad employees aided, abetted and encouraged, and even shared in the assault. Besides, from the other facts in evidence, and not denied, such error (if it had been error) would have been too minute and immaterial to justify a new trial.

No court of justice can tolerate such conduct as that of the agents of the defendant towards the mob in its assault upon the plaintiff, while entitled to the protection of a passenger at its hands.

Petition dismissed.

Connor, J., *concurring*. I have carefully examined the record in this case, especially those portions referred to in the petition to rehear. I do not understand that any denial is made of the principle upon which the defendant's liability for a breach of duty to protect the plaintiff from injury or assault is made, or that it is denied that if the defendant's agents participated therein or failed to protect the plaintiff from such assault, if they could have reasonably apprehended or prevented the same, is brought into question by the petition to rehear. The authorities cited in the opinion filed at last term amply sustain the conclusion reached by the Court, and I do not deem it necessary to review them or further discuss that phase of the case.

The first assignment of error in the petition is a suggestion that "on pages 72 and 73 of the record the re-direct examination of Thomas McBryde discloses two exceptions, being numbers 4 and 5." It was urged that his declaration could not be considered as a part of the *res gestæ*. "It was a narrative

of a past occurrence and could only have been received for
the purpose of corroboration; that the judge did not restrict
it to that purpose, but left it to the jury without explanation."
The petitioner says these exceptions were overlooked by the
Court. The record, in respect to this testimony, shows that
the witness was being examined in regard to seeing a man
raise his arm and motion in the direction of the plaintiff.
The Court asked him if he said anything to plaintiff at the
time he saw the motion made, to which witness responded:
"Not at that time, but afterwards." Counsel then asked:
"How long afterwards?" Witness answered: "Just right
afterwards." Objected to by defendant; overruled. De-
fendant excepted. Q. "What did you tell Seawell when that
motion was made?" Defendant's counsel interposed the
question: "How long afterwards—how many minutes?"
Ans. "It was a minute." Plaintiff's counsel then asked:
"What did you say?" Witness answered: "I told Mr. Sea-
well that that man with the red head threw an egg at him, for
I saw him do it." Counsel asked: "Had Seawell made an
assault on him?" Ans. "No, sir." Defendant objected to
this evidence; overruled. Exception. It appears that this
witness had sworn on his direct examination that he was the
news-boy on the train; that he saw but one egg thrown; that
it was by Paul Carroll, "a red-headed fellow." That witness
was standing on the platform. It seems that in consequence
of what witness said, plaintiff went to Carroll, drew his cane
and asked him if he threw the egg. Carroll denied it. After
the first egg was thrown, two others were thrown. About two
and three-fourths minutes elapsed between the throwing of the
first and the last egg. It is very difficult, unless the entire
testimony is set out, to describe the transaction as it occurred.
It will be well to keep in mind that all the eggs were thrown
while the cars were standing at the depot, about three minutes.
It is very doubtful whether, under the rules prescribed by

the Court for noting exceptions, the record presents any exception to the portion of the testimony to which the assignment of error is pointed. However this may be, I think the declaration of McBryde was competent as a part of the *res gestæ.* He testified that it was made a minute after Carroll threw the first egg and before the transaction was concluded. It is difficult to fix the precise time within which a declaration must be made to entitle it to be admitted as a part of the *res gestæ.* We do not find that the courts or text-writers have undertaken to do so. The principle under which such testimony is admitted as an exception to the general rule rejecting hearsay evidence is discussed and the authorities reviewed by *Mr. Justice Montgomery* in *Bumgardner v. Railroad,* 132 N. C., 438. See also *Harrill v. Railroad,* 132 N. C., 655. In *State v. McCourry,* 128 N. C., 594, the Court, speaking through *Mr. Justice Clark,* quotes with approval the following language from 1 McLain Cr. Law, sec. 411: "Evidence of the entire transaction is admissible, and of the surroundings." "Declarations and exclamations made by by-standers have been held admissible as a part of the transaction." *Ibid.,* sec. 411. *Mr. Underhill,* in his work on Criminal Evidence, secs. 96 and 97, says: "On the whole, the *res gestæ* cannot be arbitrarily confined within any limits of time. The element of time is not always material. If the declarations are narrative and descriptive in their form and character, if they are not the impromptu outpourings of the mind, they should be rejected, though uttered only a few minutes after the main transaction. The spontaneous, unpremeditated character of the declarations, and the fact that they seem to be the natural and necessary concomitants of some relevant transaction in which their author was a participant, constitutes the basis of their admission as evidence. If a sufficient period has intervened between the act and the statement for consideration, preparation or taking advice, the statement

may be rejected. The mere likelihood or probability that the statement was the result of advice or consideration may exclude it. Actual preparation need not be shown. Declarations made immediately after the principal transaction have been received in homicide cases. And the American cases, as a rule, do not sustain the strict English doctrine that the declarations, to be admissible, must be strictly contemporaneous with the main transaction, if the declarations are illustrative verbal acts and not mere narratives of what has passed."

It would be difficult to reconcile the numerous cases in which the competency of declarations, offered as a part of the *res gestœ*, are admitted or rejected. We can only seek to adhere to the general principles and apply it to the cases as they arise. I think the declaration in this case is within the principle.

The next assignment of error is that the plaintiff was permitted to show by Ramseur that he was laughing at the egg-throwing after it was over; that the admission of this as substantive testimony was erroneous, and that his Honor expressly said that he admitted it as affecting the credibility of the witness. As the train came up Ramseur went to the express car; he heard a noise and looked around and saw that the egg had struck the plaintiff; that he was reaching down pulling something out of his collar. The witness went back of the platform, and did not go where the plaintiff was. To the question, "You were laughing at the time?" he answered: "I suppose I was laughing, like everybody else was." He said that he was laughing as he started back when he saw the plaintiff getting the egg out of his collar. To the question, "What were you laughing at?" he answered: "I reckon I must have been laughing at that." He further said that he saw the plaintiff go up to Carroll and raise his cane. The witness then went behind the semaphore, where he could not see the plaintiff; did not intend to hide from him; made no

remonstrance to the egg-throwing. It was in evidence on the part of the plaintiff that the crowd throwing the eggs had been in the witness' office and that they came out together with the witness. The witness had denied this, and had testified that he saw no eggs thrown. It was further in evidence that two eggs were thrown after the witness saw the plaintiff getting eggs from his collar. Taking the whole testimony together, the fact elicited from Ramsour that he was laughing at the time and under the circumstances, was competent evidence to be considered by the jury, bearing upon the question whether he was aiding, abetting and encouraging the crowd in throwing the eggs, or failing to discharge his duty to protect the plaintiff.

It will be observed that the plaintiff declares in two causes of action: the first charging active participation in the assault, and the second, that they neglected, failed and refused to restrain the conduct of the persons making the assault, or in any manner interfere with them, or to protect or offer protection to the plaintiff against said assaults, etc. Certainly the fact testified to by him was relevant to the second cause of action. It could not successfully be contended that the agent of a railroad company could, under the circumstances testified to by the witness, pursue the course which he describes without a violation of duty to the passenger who was entitled to his protection, or at least to some effort to protect him after he saw the conditions by which he was surrounded. It is true there was much conflicting evidence in regard to these matters, but in the light of the charge the jury have found the fact to be as contended by the plaintiff. The fact that his Honor stated that it was competent to affect the credibility of the witness cannot affect the right of the plaintiff to have it considered by the jury in any other light to which he was entitled. The learned counsel for the defendant earnestly insists that this ruling is in conflict with the case of *Phifer v.*

*Railroad,* 122 N. C., 940. In that case the issue was directed to the inquiry of negligence. The plaintiff was asked the question: "Were you careful?" *Mr. Justice Montgomery,* speaking for the Court, says: "The answer to the question was one of opinion merely, and whether the plaintiff was careful while engaged in his work upon the trestle was not a matter of expert testimony, but of judgment and common experience to be passed upon by the jury upon a detailed statement to them of the facts and circumstances connected with his conduct on that occasion." With reference to the contention of counsel, there is a marked distinction between the two cases. Whether or not a man was laughing and at what he was laughing are not expressions of opinion, but are statements of fact. The answer to this question does not involve, certainly in common parlance, any detailed statements of facts. It simply describes the frame of mind, attitude and feeling in respect to the transaction which was being investigated. Surely no objection could be made to asking a witness whether he was crying, whether he was mad, whether he was standing still or moving. These and like questions are competent for the purpose of showing the relation which the witness bore at the moment to the transaction and the parties thereto. The Court well decided that whether or not a man was careful depended not upon his own opinion, but upon the statement of facts, conduct, attitude, etc., from which the conclusion was to be drawn by the jury. After the most careful consideration we are of the opinion that the exception cannot be sustained.

The next exception states "that there was no testimony to show that Ramsour, the agent, knew that any assault was contemplated, nor that it was made, until it was actually made, when he was further from the crowd than the plaintiff was; and all the evidence shows that with the means at hand it could not have been possible for him to have prevented it."

There was evidence from which the jury might have inferred that Ramseur knew or had reason to apprehend that some assault upon the plaintiff was contemplated by the parties who came to the station. The plaintiff testified that, while he was walking up and down at or near the track, he saw some people coming from the direction of Shelby towards the station, walking very rapidly; that they went into the station somewhere; that there were three doors on that side next to the track; that one door entered into the private ticket office and another into the ware-room; that these people would go into one of these doors, his recollection is, the middle door, stay in there a little while, and then line up on the platform and laugh and talk among themselves, nudge each other with their elbows, eyeing the plaintiff; that he paid very little attention to it, and that a remark of Mr. Webb called his attention to it more than anything else; that when the train was announced the door of the office, or room in which these people were, was opened and a man "with books or papers" of some kind came out, and the crowd came out with him; some came out in front of him; these were the men who threw the eggs; the man with the "books or papers under his arm" came out in the midst of the crowd and the crowd lined up, all except the man with the books and papers under his arm; that he walked in the direction of the end of the platform towards Charlotte. There was evidence to the effect that Ramseur was the man with the books and papers. This evidence, if believed by the jury, was sufficient to justify the inference that the agent knew, or had reasonable grounds to believe, that some assault was about to be made upon the plaintiff. It is true that the agent denies all of this, but we are not passing upon the weight of the evidence.

The next assignment of error is directed to what is said in regard to the action of the Court during the trial. The opin-

SEAWELL *v.* RAILROAD CO.

ion filed at the last term disposes of this phase of the case and there is no necessity for a further discussion of it.

The other exceptions are directed to the suggestion that Ramseur was sixty feet from the plaintiff and as far or further from the crowd as the plaintiff, and that there was no available means of stopping the egging or laughing and jeering. His Honor fairly submitted this aspect of the case to the jury, and their verdict will not be disturbed.

It is further assigned as error that the Court considered the evidence that Thrower, the conductor, was within fifteen or twenty feet of the plaintiff and offered no protection, and did not consider all of the evidence that he was much further from the crowd than the plaintiff was, and that the conductor was too far from the crowd to afford protection. The deposition of Thrower, the conductor, was read without objection, and no instructions were asked by the defendant in regard to his testimony or his conduct, nor was any reference made to it by his Honor in his charge. The case was tried, evidently, upon the conduct of Ramseur and Carroll. If there was anything in the testimony of Thrower, which the defendant regarded as injurious, or if it desired the Court to withdraw any part of the testimony, or specially charge the jury in regard thereto, it should have so requested.

This case, while one of first impression, and we think it not improper to say we sincerely trust of last occurrence, has received the most careful consideration. This Court deals entirely with the question as to the liability of the corporation, without regard to the active actors in the transaction except in so far as the defendant's duty is concerned. Upon the well-settled principles enunciated by this Court and sustained by the authorities, there is no reversible error in the record, and the petition to rehear is dismissed.

Petition dismissed.

WALKER, J., concurs in the concurring opinion.