STATE v. HENRY E. SPIVEY.

(Filed 3 November, 1909.)

1. Appeal and Error — Brief — Exceptions Abandoned — Criminal Cases.

Exceptions appearing of record and not mentioned in the brief are deemed abandoned on appeal in criminal as well as civil actions.

2. Evidence, Secondary—Bloodhounds.

Evidence of the conduct of a bloodhound in tracking the accused after the offense was committed is competent to corroborate other evidence competent as tending to establish his guilt. *State v. Freeman,* 146 N. C., 616, and other cases cited and approved.

3. Evidence—Declarations—Res Gestae.

The declarations of deceased made directly after he received the fatal shot, that defendant had shot him because he saw him,

is competent against defendant on trial for the murder of deceased, when it appears that the declaration was made spontaneously, without design or premeditation.

4. **Appeal and Error — Murder — Witnesses — Tender of Wife — Instructions—Harmless Error.**

While it is improper for the solicitor to tender the wife of defendant on trial for his life, stating that he would not tender her if defendant did not wish to examine her, the error is cured by a clear instruction that this should not prejudice defendant or in any manner influence the jury in their verdict against him.

5. **Instructions Substantially Given.**

The judge is not required to give a charge to the jury in the language of a special instruction requested, and when the charge is as responsive to the request as the prisoner was entitled, there is no error therein.

6. **Instructions—Murder—Questions of Law—Directing Alternate Findings.**

When the entire evidence shows, and no other reasonable inference can be fairly drawn therefrom, that the murder was committed either by lying in wait or in an attempt to perpetrate a felony, and the controverted question is the identity of prisoner as the murderer, the trial judge does not commit error in charging the jury to render a verdict of guilty of murder in the first degree or not guilty.

APPEAL from *W. J. Adams, J.,* March Term, 1909, of BLADEN.

The defendant was indicted for the murder of Frank Shaw, his father-in-law, on the night of 10 December, 1908, in Bladen County, and, upon his plea of not guilty, was tried and convicted of murder in the first degree, and from the sentence of death pronounced by the court he appeals to this Court.

The immediate circumstances of the homicide are detailed in the testimony of Eugenia Shaw, the wife of the deceased, as follows: "Frank (the deceased) was hauling cotton to Mr. Nance's. He came that evening about dusk. There was a walking around the house and noise under the house, and the dog got after it. I don't know just what time it was—it was late bedtime. First thing I heard was a walking around the house, like somebody under the house, and the dog got to baying it. Frank got up and went out. The gun fired. Me and my daughter (the wife of the prisoner) went out about a minute or two after the gun fired. Just as soon as we heard the gun fire, we went out. Frank was down on his hands and knees, at the corner of the house, struggling in blood." Dr. Clark was called in that night, and said the load of shot took effect in the face, tongue and throat of the deceased; both eyes were shot out, and the gun was fired from a point in front of the deceased; that he found the tracks of the murderer at the corner of the house; and under the

house a chamber, partly filled with kerosene oil and shucks, and indications of a lighted match that went out; that it was a moonlight night. It was in evidence that the vessel belonged to the prisoner's wife and was last seen at her house; that prisoner's wife was a daughter of the deceased and had separated that day from him and returned to her father's; that prisoner called at the gate during the afternoon, and, calling his wife out, told her, with an oath, that if she did not leave her father's house he would kill her or her father that night, and, as he walked off, said: "I'll burn you up." A son of the deceased, awakened by the shot, saw the prisoner running away, with a gun in his hands. There was evidence of bad blood between the prisoner and the deceased, and of other threats made by the prisoner. Bloodhounds were put on the trail the next day and followed the track to prisoner's house and to his father's. The prisoner offered evidence that, at the time of the shooting and the entire night, he was at his father's, two and a half miles from the home of the deceased, and that when accused the next morning of the homicide he denied it. There was much evidence on the part of the State corroboratory of its theory, and from the prisoner, attacking the State's witnesses and sustaining his *alibi.* The dying declarations of the deceased were offered by the State, that the prisoner shot him, and the declarations of the deceased to his wife, that the prisoner shot him, were offered and admitted as part of the *res gestae.* The deceased lingered a few days, and died from the effect of the gunshot wounds received the night of 10 December, 1908.

*Attorney-General* for the State.
*McLean, McLean & Snow* and *McIntyre, Lawrence & Proctor* for defendant.

MANNING, J. In the statement of the case there are twenty-one exceptions noted and embraced in the prisoner's assignment of errors, but in the well-considered brief of his able and learned counsel only the following numbered exceptions are mentioned, to-wit, exceptions 4, 8, 9, 12, 13, 15, 16, 17, 18, 19, 20 and 21. Under Rule 34 (140 N. C., 666) and the decisions of this Court, those not mentioned are deemed abandoned. This rule applies equally to civil and criminal cases. *Britt v. Railroad,* 148 N. C., 37; *State v. Freeman,* 146 N. C., 615; *State v. Register,* 133 N. C., 746. We have, however, *in favorem vitae,* carefully examined the exceptions omitted in the brief for the prisoner, and we do not think any one of them can be sustained. Excep-

tions 20 and 21 are formal—the one taken to the refusal of the court to grant a new trial for errors alleged in the trial, and the other to the judgment of the court pronouncing the sentence of death, as demanded by the law, upon the verdict. Exceptions 8 and 9 are taken to the rulings of his Honor permitting a witness for the State (Edmond) to narrate the conduct of a bloodhound used by him the day after the homicide in tracking the defendant. This evidence was admitted by his Honor after the State had, by testimony, brought it clearly within the rules laid down by this Court for its admissibility, in the cases of *State v. Moore,* 129 N. C., 501; *State v. Hunter,* 143 N. C., 607; *State v. Freeman,* 146 N. C., 616. In his charge his Honor clearly stated to the jury how they should consider this evidence; that it was not substantive, but corroboratory; and before it could be considered as corroboratory they must be satisfied, beyond a reasonable doubt, of the existence of other relevant circumstances in connection therewith, as held in the above cases. No exception was taken to this part of his Honor's charge. It was full and clear. We therefore find no error in exceptions 8 and 9.

The prisoner's fourth exception is taken to admission in evidence, over his objection, of the following declarations of the deceased (Frank Shaw) to his wife, on the night of the homicide and immediately thereafter: "Frank told me Henry Spivey shot him; said, 'Oh, Jenny, Henry Spivey shot me, because I saw him.'" The witness (wife of deceased) had given the following account of the events immediately preceding and at the time of this declaration: "First thing I heard was a walking around the house, like somebody under the house, and the dog got to baying it. Frank got up and went out. The gun fired. Me and my daughter went out about a minute or two after the gun fired. Just as soon as we heard the gun fire, we went out. Frank was down on his hands and knees, at the corner of the house, struggling in blood. I went to him and took him up, and said, 'What is the matter?' Me and my daughter were the first to get to him. I took him up, first one, about two minutes after gun fired—just about a minute after gun fired. I shoved out; never waited for nothing. Frank said, 'Henry Spivey shot me, because I seed him.'" After then, being permitted to give this statement of the deceased, the witness added: "He said it two or three different times after he was set up on the piazza." Was this statement of Frank Shaw to his wife admissible as *pars rei gestae?*

In McKelvey on Ev., p. 344, the author says: "The ground of reliability upon which such declarations are received is their

STATE *v.* SPIVEY.

spontaneity. They are the *ex tempore* utterances of the mind, under circumstances and at times when there has been no sufficient opportunity to plan false or misleading statements; they exhibit the mind's impressions of immediate events, and are not narrative of past happenings; they are uttered while the mind is under the influence of the activity of the surroundings." In Underhill on Criminal Evidence, secs. 96 and 97, quoted with approval by *Connor, J.,* in the concurring opinion in *Seawell v. Railroad,* 133 N. C., 515, the author says: "On the whole, the *res gestae* cannot be arbitrarily confined within any limit of time. The element of time is not always material. If they are declarative and descriptive in their form and character, if they are not the *impromptu* outpourings of the mind, they should be rejected, though uttered only a few minutes after the main transaction. The spontaneous, unpremeditated character of the declarations, and the fact that they seem to be the natural and necessary concomitants of some relevant transaction in which their author was a participant, constitutes the basis of their admission as evidence. If a sufficient period has intervened between the act and the statement for consideration, preparation or taking advice, the statement may be rejected. The mere likelihood that the statement was the result of advice or consideration may exclude it. Actual preparation need not be shown. Declarations made immediately after the principal transaction have been received in homicide cases, and the American cases, as a rule, do not sustain the strict English doctrine that the declarations, to be admissible, must be strictly contemporaneous with the main transaction, if the declarations are illustrative, verbal acts and not mere narratives of what has passed." In Wharton's Criminal Evidence, sec. 263, this learned writer says: "Under the rule before us, evidence in homicide trials has been received . . . of statements of the deceased, at the time or so soon before or afterwards as to preclude the hypothesis of concoction or premeditation, charging the defendant with the act." Following the rule clearly established by these authorities, a statement made as the "outpouring of the mind" of one of the actors in the tragedy is competent as *pars rei gestae.* We conceive there is, and ought to be, a distinction made between the statements of one of the parties to the tragedy and a bystander or nonparticipant. In the latter case, where the evidence proposed is the statement of a bystander or nonparticipant, whose mind is unmoved by the terrible emotions that overflow and express themselves in words uttered without design or thought or preparation, it must appear, to be admissible, that such statement was made

while the thing was being done, the transaction was occurring; they ought to be strictly contemporaneous. *State v. McCourry,* 128 N. C., 598; *Seawell v. Railroad,* 133 N. C., 515; *Harrill v. Railroad,* 132 N. C., 655; *Bumgardner v. Railroad,* 132 N. C., 442; *Meares v. Railroad,* 124 N. C., 578; *State v. Hinson,* 150 N. C., 827. In cases of joint action or conspiracy, where the evidence has disclosed a common unlawful purpose of two or more, or a concert of action, statements are admissible to prove the common, unlawful purpose that would not be admissible otherwise, as in *State v. Anderson,* 92 N. C., 732; *State v. Jarrell,* 141 N. C., 722. In our opinion, therefore, the statement of the deceased to his wife, as detailed by her, was admissible, and his Honor committed no error in receiving it.

The twelfth exception is taken to the following incident occurring at the trial:. At the close of the testimony of the last witness examined by the State, and before the evidence was closed, the solicitor tendered to the prisoner several witnesses, among them the prisoner's wife, for examination. The prisoner objected to the tender of his wife; thereupon the solicitor withdrew the tender, stating that he found the name of defendant's wife among the witnesses for the State and thought it was his duty to tender her to defendant, stating also that he would not tender this witness to defendant if defendant did not wish to examine her. The defendant objected. The court then instructed the jury that this incident could not be construed by them, in making up their verdict, as prejudicial to the defendant or in any way influencing their verdict against him. His Honor, near the close of his charge, again said to the jury: "At the close of the evidence the solicitor called certain witnesses, whom he tendered to the prisoner for examination. Among these was the wife of the prisoner. The solicitor stated that as he found the name of the prisoner's wife upon the list of witnesses for the State, he deemed it his duty to tender her to the prisoner for examination. The court charges you that the wife of the prisoner is not a competent witness against the prisoner, and that her testimony could not be used against him on this trial. The court charges you, further, that it is your duty to disregard the circumstances of the tender of the prisoner's wife by the solicitor, and that such tender cannot be used as a circumstance against the prisoner. The circumstance of her having been tendered, therefore, must be entirely disregarded and ignored by the jury in arriving at their verdict." We have set out in full the matters pertaining to this incident to illustrate how careful his Honor was, not only in the conduct of the trial, but in his

charge, to see to it that the prisoner had a fair and impartial trial. There was a similar incident in *State v. Cox,* 150 N. C., 846, but his Honor, in the present case, observed the caution pointed out in that case, which the learned judge who tried *Cox's case* had unintentionally failed to observe. While it was improper for the solicitor to tender the prisoner's wife, with the remark made by him, yet his Honor corrected the error fully; and we therefore overrule this assignment of error.

The thirteenth assignment of error is the refusal of his Honor to give the following special instruction in its very language: "The defendant in this case is indicted for the murder of Frank Shaw, and before you can return a verdict of guilty against him you must find that he committed the murder, as charged in the bill of indictment. If there is any reasonable doubt about this in the minds of the jury, or if the jury shall be of opinion, from the evidence, that some person other than Henry Spivey either committed or might reasonably have committed the murder, Henry Spivey not being present, aiding and abetting, then the jury must return a verdict of not guilty." We have carefully examined the charge of the learned judge, and, in our opinion, the instructions given by him upon the matter contained in this prayer were as fully responsive to the request as the prisoner was entitled, and the jury fully and properly instructed by him. The judge was not obliged to instruct in the very words of the prayer. This is well settled. *State v. Booker,* 123 N. C., 713, and cases cited.

Assignments of error 15, 16, 17, 18 and 19 are to the charge of the court that there was no evidence upon which the jury could convict the prisoner of manslaughter or of murder in the second degree; that the verdict should be "guilty of murder in the first degree" or "not guilty." His Honor instructed the jury that, "Before you can convict the prisoner, you must be satisfied beyond a reasonable doubt, upon all the evidence, that the deceased was shot, and that the wound so inflicted caused the death of the deceased, and that the prisoner is the man who did the shooting; and unless you are so satisfied of each one of these circumstances beyond a reasonable doubt, you will return a verdict of 'not guilty.' If, however, you are satisfied beyond a reasonable doubt, upon all the evidence, that the prisoner, on the occasion referred to, went to the house of the deceased and lay in wait for the deceased, and that the deceased went into the yard, and that thereupon the prisoner shot the deceased, and that the wound so inflicted caused the death of the deceased, you will return a verdict of 'murder in the first degree.' If you find

from the evidence, beyond a reasonable doubt, that, for the pur-
pose of burning the dwelling house of the deceased, and while in
the attempt to perpetrate such arson, the prisoner shot deceased,
and the wound thus inflicted caused the death of the deceased,
you will return a verdict of 'murder in the first degree.' "   These
assignments of error again present directly for our determina-
tion whether, upon the trial of a prisoner indicted for murder in
the first degree, and the evidence discloses the homicide com-
mitted by lying in wait, or in an attempt to perpetrate a felony,
or by poisoning, or starvation, or imprisonment, the court can
charge the jury that there is no evidence of murder in the second
degree or manslaughter, and their verdict will be either "guilty
of murder in the first degree" or "not guilty." In the present
case the murder was committed by lying in wait, or in the
attempt to perpetrate the crime of arson. There was no evidence
from which the jury could have found murder in the second
degree or manslaughter. So sharply was this the contention
between the State and the prisoner, that the record does not dis-
close any prayer from the learned counsel of the prisoner pre-
senting the view of murder in the second degree. The only
inference that could have been drawn from the evidence was that
a murder in the first degree, by lying in wait or attempting to
perpetrate arson, had been committed; and if the prisoner was
the criminal, then his crime was murder in the first degree. In
*State v. Gilchrist,* 113 N. C., 673, the first case coming before
this Court in which the act of 1893 (now sections 3631 and 3271,
Revisal) was construed, the evidence tended to show that pris-
oner killed the deceased by waylaying the road on which the
deceased was returning from his work at night; that the prisoner
concealed himself behind some trees on the side of the road and
killed deceased with an axe as he was passing. The trial judge
instructed the jury that the prisoner was guilty of murder in
the first degree or not guilty. This Court, *MacRae, J.,* writing
the opinion for a unanimous Court, said: "There was no evi-
dence on which to warrant a verdict of 'murder in the second
degree' or of 'manslaughter.' The evidence, if believed, would
warrant only a verdict of 'murder in the first degree.' "

In *State v. Rose,* 129 N. C., 575, the deceased was shot and
killed by the prisoner, from ambush, as the deceased and a friend
were riding along a road in a buggy. The trial judge instructed
the jury that they must return a verdict of "guilty of murder in
the first degree" or "not guilty." This Court, without dissent,
sustained the charge, and said: "All the evidence tends to show
that the killing was done by some one 'lying in wait,' which

comes expressly within the statutory definition of murder in the first degree. There was no evidence of an altercation or a killing under any other circumstances. If the prisoner was the man who fired the fatal shot, he was guilty of murder in the first degree; and if this was not shown beyond a reasonable doubt, the jury should and the judge's charge would have acquitted the prisoner." In *State v. Dixon,* 131 N. C., 808, the deceased was shot by some one lying in ambush along the road. The trial judge instructed the jury that they should return a verdict of "murder in the first degree" or "not guilty." This Court, in a unanimous opinion, said: "The judge properly told the jury that they should return a verdict of 'murder in the first degree' or 'not guilty.' All the evidence tended to show a killing by shooting from ambush, and there was nothing to contradict this; and the sole question, if the evidence was believed, was simply whether the prisoner was, beyond all reasonable doubt, the slayer. *State v. Rose,* 129 N. C., 575. We find no error in the judge's charge, in any of the matters excepted to." These three cases are the only cases presented to this Court since the act of 1893 where the evidence showed that the homicide was committed by lying in wait, and in each, on appeal, this Court sustained the charge of the trial judge, that the jury must find the prisoner guilty of murder in the first degree or not guilty. This same charge was given by the learned judge who tried the present case. In *State v. Lochlear,* 118 N. C., 1154, the majority of this Court (*Clark* and *Montgomery, JJ.,* dissenting) held that there was some evidence from which the jury could have inferred that the homicide was committed by other means than lying in wait, and disapproved the charge by the trial judge, "that there was no evidence of murder in the second degree in the case now on trial," and granted a new trial for this error. In *State v. Covington,* 117 N. C., 834, the evidence disclosed that the deceased was shot and killed in the night time, in his store, where he slept, by the prisoner while burglarizing the store, and the facts attending the killing were shown by the confessions of the prisoner. The trial judge charged the jury that, if they were satisfied beyond a reasonable doubt of the prisoner's guilt, their verdict would be "murder in the first degree"; that there was no evidence of murder in the second degree or manslaughter. The prisoner, being convicted of murder in the first degree, appealed, and this Court sustained the charge, saying: "The charge is correct, if there is no evidence of murder in the second degree or manslaughter." All these cases were instances of murder committed in one of the specific ways mentioned in the statute, and

therein declared to be murder in the first degree. Whenever the
evidence discloses that the crime committed is murder—that is,
the intentional and unlawful killing of a human being—and the
evidence further discloses that the murder was done in one of
the specific ways named in the statute, then it is murder in the
first degree. *State v. Banks,* 143 N. C., 652; *State v. Stitt,* 146
N. C., 643; *State v. Daniel,* 134 N. C., 671, and cases cited,
*supra.* In this class of murder the law imputes malice and pre-
meditation is necessarily presumed. In *State v. Thomas,* 118
N. C., at p. 1121, this Court said: "The word which distinctly
marks the two degrees is 'premeditated.'" And, further, "Where
the killing is not done by lying in wait, poisoning, or in any of
the specific ways pointed out in the statute, and the test of its
classification as murder in the first degree is the question whether
there has been premeditation and deliberation, the prosecuting
officer cannot rest the case for the State upon proof of the pre-
vious existence of actual malice." The only decision of this
Court that is not in harmony with the cases cited, and the law
upon this question, as we declare it to be, is the case of *State v.
Gadberry,* 117 N. C., 811. The evidence in that case showed, in
its only aspect, that a murder was done, and it was done in an
attempt to abduct the deceased—a girl under the age of fourteen
years—abduction being made a felony by our law (Revisal, sec.
3358). The trial judge, one of the present learned Associate
Justices of this Court, charged the jury that, if they believed the
evidence beyond a reasonable doubt, the crime of the prisoner
was murder in the first degree. This Court, on appeal, decided
by a divided Court that this charge was erroneous. We do not
think that case, upon the evidence, well decided. There was no
evidence upon which the judge below could have predicated a
charge of murder in the second degree or manslaughter, nor was
there any evidence from which the jury could have fairly de-
duced the crime of murder in the second degree or manslaughter.

After a careful review of the decisions of this Court, and a
critical examination of the statute (Revisal, sections 3631 and
3271), we deduce the following doctrine: Where the evidence
tends to prove that a murder was done, and that it was done by
means of poison, lying in wait, imprisonment, starving, torture,
or which has been committed in perpetration or attempt to per-
petrate any arson, rape, robbery, burglary or other felony, and
where there is no evidence and where no inference can fairly be
deduced from the evidence of or tending to prove a murder in
the second degree or manslaughter, the trial judge should in-
struct the jury that it is their duty to render a verdict of "guilty

of murder in the first degree," if they are satisfied beyond a reasonable doubt, or of "not guilty." If, however, there is any evidence or if any inference can be fairly deduced therefrom, tending to show one of the lower grades of murder, it is then the duty of the trial judge, under appropriate instructions, to submit that view to the jury. It becomes the duty of the trial judge to determine, in the first instance, if there is any evidence or if any inference can be fairly deduced therefrom, tending to prove one of the lower grades of murder. This does not mean any fanciful inference tending to prove one of the lower grades of murder; but, considering the evidence "in the best light" for the prisoner, can the inference of murder in the second degree or manslaughter be fairly deduced therefrom. When the evidence discloses a murder in one of the specific methods which, by the statute, is made *per se* murder in the first degree, "the State is not required to prove premeditation, because the manner of doing the act necessarily involves premeditation, unless the prisoner is mentally incapable of deliberation or doing an intentional act. The jury must, of course, be instructed that they must be satisfied beyond a reasonable doubt that the evidence brings the murder within one of the specific methods mentioned in the statute, and that the prisoner perpetrated the murder, and that the prisoner was mentally capable of committing the crime." "Under the construction of the statute by this Court, in *State v. Gilchrist,* 113 N. C., 673, and *State v. Norwood,* 115 N. C., 789, the third section (now section 3271, Revisal) does not give jurors a discretion, when rendering their verdict, to determine of what degree of murder a prisoner is guilty. They must render a verdict according to the evidence; and believing a prisoner guilty, beyond a reasonable doubt, of murder in the first degree, it is their duty so to find, however much inclined to show mercy by rendering a verdict for a lesser offense. Their obligation in that respect has not been changed by the statute, and it is the same that it was upon the trial for homicide before its enactment, and the question was whether the prisoner was guilty of murder or manslaughter." *State v. Covington,* 117 N. C., 834. A careful reading of the evidence in this case shows the murder to have been done in one of only two ways, to-wit, by lying in wait or in the attempt to commit arson; and, done by either method, the statute makes the crime murder in the first degree. In our opinion, the trial judge properly so instructed the jury. Considering the momentous result, to the prisoner, of our conclusion, we have given his appeal the most careful thought, and declare that there was in his trial

No error.