## STATE v. CHARLES PERRY.

### (Filed 18 March, 1936.)

**1. Homicide H c—Where evidence warrants a verdict of murder in the second degree, the question must be submitted to the jury.**

It is only when all the evidence tends to show that the homicide was committed by means of poison, lying in wait, imprisonment, starving, torture, or in the perpetration or attempt to perpetrate a felony, that the court may instruct the jury to return a verdict of guilty of murder in the first degree or not guilty, and where the evidence tends to show that defendant killed deceased with a deadly weapon and no evidence that the homicide was committed by lying in wait or in the perpetration or attempt to perpetrate a felony, the court must submit the question of murder in the second degree to the jury, although there is ample evidence of premeditation and deliberation, the evidence of premeditation and deliberation being for the jury upon the question of whether the crime was murder in the first or second degree.

**2. Homicide G b—Killing with deadly weapon raises presumption of second degree murder only.**

A killing with a deadly weapon raises the presumption that the homicide was murder in the second degree, and if the State seeks a conviction of murder in the first degree it has the burden of proving beyond a reasonable doubt that the homicide was committed with deliberation and premeditation.

CLARKSON, J., dissenting.

APPEAL from *Sinclair, J.,* at October Term, 1935, of HERTFORD. New trial.

*Attorney-General Seawell and Assistant Attorney-General McMullan for the State.*

*C. W. Jones and J. H. Matthews for defendant, appellant.*

SCHENCK, J. This is a criminal action wherein the defendant appeals from sentence of death based upon a verdict of guilty of murder in the first degree. Under the view we take of the case, it becomes necessary for us to consider only one group of the defendant's assignments of error, namely, those relating to the failure of the court to submit to the jury the issue of murder in the second degree.

The State offered evidence to the effect that the defendant made a confession in which he stated that he was with Joseph Terry late at night, and that Joseph Terry went into his house, out of sight of the defendant, and fired the fatal shot that killed the deceased. The State also offered in evidence the testimony of Joseph Terry to the effect that he and the defendant were out together at night and that the defendant told him (witness) that he (defendant) had shot and killed the deceased during an interval when they were separated. No eye-witness to the homicide was introduced. The evidence as to how the actual killing was accomplished is entirely circumstantial. While there was evidence of threats and of motive and of other facts and circumstances amply sufficient to take the case to the jury upon the issue of murder in the first degree, there was no evidence that the crime was committed by any of the means specifically mentioned in the statute defining the two degrees of murder or in the perpetration or attempt to perpetrate a felony, as delineated in C. S., 4200.

The defendant offered no evidence.

The court charge the jury to return a verdict of guilty of murder in the first degree or not guilty.

It is only in cases where all of the evidence tends to show that the homicide was committed by means of poison, lying in wait, imprisonment, starving, torture, or in the perpetration or attempt to perpetrate

a felony, that the trial judge can instruct the jury that they must return a verdict of murder in the first degree or not guilty. In those cases where the evidence establishes that the killing was with a deadly weapon the presumption goes no further than that the homicide was murder in the second degree, and if the State seeks a conviction of murder in the first degree it has the burden of proving beyond a reasonable doubt that the homicide was committed with deliberation and premeditation. Under such circumstances it is error for the trial judge to fail to submit to the jury the theory of murder in the second degree, since it is the province of the jury to determine if the homicide be murder in the first or in the second degree, that is, whether they, the jury, are satisfied beyond a reasonable doubt, from the evidence, that the homicide was committed with deliberation and premeditation. Whenever there is any evidence or when any inference can be fairly deduced therefrom tending to show a lower grade of murder, it is the duty of the trial judge, under appropriate instructions, to submit that view to the jury. The defendant is entitled to have the jury instructed to the effect that if they should find beyond a reasonable doubt that he committed the murder, and should fail to find beyond a reasonable doubt that such murder was committed with deliberation and premeditation, they should return a verdict of guilty of murder in the second degree. *S. v. Spivey,* 151 N. C., 676; *S. v. Newsome,* 195 N. C., 552.

Under the authorities cited, we hold that the failure to submit to the jury the theory of murder in the second degree entitles the defendant to a new trial, and it is so ordered.

New trial.

CLARKSON, J., dissenting: The defendant was indicted and tried for the homicide of Skidmore Nichols, on the night of 14 September, 1933, and convicted of murder in the first degree.

The defendant Charles Perry paid the rent for the house that Skidmore Nichols' wife and family lived in and he was there two or three times a week. In January, 1933, Skidmore Nichols and his wife separated. Joseph Terry, the brother of Skidmore Nichols' wife, had a house some 5 or 6 miles away. The defendant Charles Perry, Joseph Terry, and Thomas Nichols were at the house rented by defendant on Sunday morning, 15 September. Thomas Nichols, a son of Skidmore Nichols, was there and was going to Billy Terry's, and was requested by Joseph Terry to go to his home and feed his dog. When Thomas Nichols entered the house of Joseph Terry, about 12:45, he went into the house through the back door. He sat down to write a letter and smelled something peculiar. He opened the window blind in the room, the shade was down, and when he opened the blind he saw a man's foot,

and when he opened the door he saw his father—dead. Blood and brains were up and down the ceiling overhead and blood dripping on the floor. That evening Skidmore Nichols' wife and defendant Charles Perry were at Perry's own house. Perry was on the bed, Skidmore Nichols' wife was lying across the bed, and Joseph Terry was on the floor.

Thomas Nichols testified in part: "Joseph Terry asked me, in the presence of Perry, to get Joe Ben Godwin to swear he stayed at his house on Saturday night, he and Perry."

Dr. L. K. Walker, an expert, testified in part: "The body was the body of Skidmore Nichols. The body was found on the floor in the middle of the room just out from the bed. The man was lying on his back and Sheriff Parker and myself turned him over and the whole top of his skull was blown off and his brains were blown on the floor and scattered around the room and house. Pieces of his skull were found in an adjoining room. The door was open between the two rooms. The feet of the dead man were six or eight feet from the adjoining room. In the examination of the room I found blood and pieces of flesh on the ceiling and the brains and part of the hair were blown up in the ceiling of the room. I found the man lying on the floor, his brains shot out. His skull blown all to pieces, his brain tissue scattered about the ceiling and floor, his skull bones partly in an adjoining room, scattered shot all around on the bed near where the man was lying and on the floor. One thing peculiar was I didn't find any scars on the man anywhere except where the load carried his skull clean off. He was shot with a gun. I have an opinion satisfactory to myself where the load of shot entered the head. It entered in the back and took the whole top of it off clean. He was shot from a lower angle than from where he was sitting. I think he was shot with number four shot."

Sheriff C. W. Parker testified in part: "From the appearance of the wound in the head, it looked like he was shot from a lower angle from where he was sitting or standing. I examined a window there and saw the pane was out. It was just a glass of one part of the pane, I would say, about six inches pieces out of the glass. From where that pane was out and the position of the body in the house I would think the shot went through the pane from the outside of the house. He was lying on his back when I first saw him with his head towards the broken out window pane. . . . When we arrived at the house of Charles Perry we walked in the house and went in the room on the left side and found on the bed Charles Perry and Mrs. Nichols and over in the corner of the same room I found Joseph Terry. . . . Q. Now, before you said anything to anyone at that place, what, if anything, was said by anyone in the presence of Perry in respect to Mr. Nichols? Ans.: I guess it was the middle-size boy of Mrs. Nichols as I walked out of the door

with Perry and Sergeant Welch, this boy ran up behind me and asked if his daddy was dead sure enough. . . . I found blood on Perry's clothes. His clothes were dirty, sweaty, and looked like they had been wet. That is the shirt he had on. I found blood on that shirt. Several places on the front. They were cut off. He had on a hat. There was blood on it. He had on an apron to the overalls. At that time bits of flesh and pieces of hair were on the apron of the overalls. . . . The ceiling had bits of brain, hair, and flesh on it. The blood had dripped down by the window on the floor. A lot of shot were on the floor on the back side and also the gun wadding. . . . I did not see any other sign or mark of violence on the body of the deceased besides the shot in the head. . . . I found the gun in a rack over the door leading to the back porch and to the kitchen. There was no empty shell in the gun. This is the gun you hand me. It was hanging on two hooks over the door leading to the back porch from the other room in which he was killed, the room nearer Winton. He was killed in the room nearer Union. I found this loaded shell in the same room I found the gun in. The number of the shot is on the shell. They are number four shot. . . . Q. Sheriff, was any threat made towards Mr. Perry? Ans.: None whatsoever. Q. Was any inducement made to him? Ans.: No, sir, I told Mr. Perry I was not offering to do anything for him and he could not hope for any reward and he made that statement. The conversation made to me by the defendant was made yesterday in jail. *He sent for me* and said he wanted to talk with me. Q. What statement did he make then relative to where he spent the night, and what, if anything, he did that night? Ans.: He said on Saturday afternoon he met Joseph Terry in Winton and he and Joseph Terry went out to Mrs. Nichols' and had supper and sat around there for a while and then came back to Winton. He said they drank some whiskey while out at Mrs. Nichols' home and said they came back to Winton and drank some more whiskey, and then Joseph Terry told him he was going out and kill Skidmore Nichols. He said they left Reid's Filling Station and walked to the dirt road leading to Union, and they got about 30 or 40 yards down the road and stopped and had a conversation, and he said Terry told him he was going to kill old man Skidmore Nichols and that they went on; that he got in front of the house and they stopped in front of the house and Terry went around the house and in a few minutes he heard a gun fire and in a few more minutes he saw Terry come out and Terry said, 'Old man Skidmore Nichols is out of the way.' "

Jeffrey Brown testified in part: "Q. Why did he say he was on the farm? Ans.: He said the sheriff caught him in the bed with Mr. Nichols' wife. Q. What did he say in respect to what he was going to do after

STATE *v.* PERRY.

he left the farm? Ans.: He said he was going to kill Skidmore Nichols for causing all that trouble."

Odelia Terry testified in part: "I was at the home of Malissa Nichols, wife of Skidmore Nichols. . . . It was about six weeks before Mr. Nichols was killed. I stayed there two days and two nights. Charles Perry came there while I was there. He had his gun and some fish. That was the night he came. He came that evening about 3 o'clock. While he was there Mr. Skidmore Nichols came near there. I don't know how near. He came by there and went on by the house towards Winton. He came from towards Murfreesboro and passed there coming towards Winton. Mr. Perry saw him when he passed. Q. What, if anything, did Perry say? Ans.: He said he was going to kill him. I sure did hear him make that statement. . . . Q. At the time he said he was going to kill Mr. Nichols, what else did he say? Ans.: He said a damn rascal or scoundrel. Q. He was going to kill him? Ans.: Yes, sir."

J. E. Brady testified in part: "Q. Did you see him (defendant) on the day or within a few days after he came from the county farm? Ans.: I saw him the day he came from the county farm, in front of my store, sitting on a box. He got out of a car and came across there. He had been there something like a half-hour or an hour when Mr. Nichols came up on some car and got out of it and went across the street. Q. What did Charles Perry say in your presence in respect to Skidmore Nichols? Ans.: The only thing I heard him say or ever heard him say was, he didn't feel he would ever die satisfied if he couldn't run his arm down Skidmore Nichols' throat and pull his heart out of him. That is the only thing I ever heard him say."

Charles Terry testified in part: "I never saw the defendant Charles Perry before he was tried here and sent to the roads. I saw him then. Q. What statement, if any, did you hear him make on the day he was tried here in respect to Skidmore Nichols? Ans.: I heard him say that he was going to kill the s—— of a b—— if he ever got free. He was referring to Skidmore Nichols and was talking to Mrs. Nichols. Q. He was talking to Mrs. Nichols, wife of Skidmore Nichols, after being tried and convicted for what? Ans.: For being with Mrs. Nichols."

Joe Ben Godwin testified in part: "On Sunday morning, 15 September, Charles R. Perry came to my house around 4:30 o'clock or 5:00 o'clock in the morning, Sunday, 15 September. It was dark at that time. He asked me to take him home. I told him I could not take him. He wanted to know the reason I could not take him and I told him I did not have enough gas in my car to go there and back. He did not spend the night at my home. . . . The fellow who was with him said: 'Come on, let's go. I have got to go to bed.' He said, 'You

are going to fall down if you don't watch out;' and he said, 'I have already fallen down.' That is what Charles Perry said, I didn't see him."

Edgar Perry testified in part: "Charles Perry is my uncle. My father and he are brothers. I live on the highway between Cofield and Harrellsville. On Sunday morning, 15 September, I came through Cofield and found Charles Perry there when I got there. . . . I got there about 7 o'clock. Charles Perry said, 'If you are going to Winton, I want to ride with you.' . . . We took him down the road a quarter of a mile past Parker's Ferry Road. I know where Mrs. Nichols lives. I judge where we stopped was one mile this side of her home."

W. J. Manly testified in part: "I heard Charles Perry at my door Sunday morning about 5 o'clock. It was not dark. . . . I did not see any other man out there with him, but I heard Mr. Perry talking to some other person."

Brandon Smith testified in part: "I saw Charles R. Perry Sunday, 15 September. He was at my house and asked me to take him home. It was after midnight and before day. . . . Another man was out there with him. I could hear them talking to each other."

Joseph Terry testified in part: "Charles Perry dodged me at Cofield and was gone one hour and a half or two hours. I didn't do anything while he was gone. He did not make any statement to me as to where he was going or why he was going. He got back to Cofield about midnight. He came back alone. Only my dog was with him. When I saw my dog with him I asked him where he had been. He didn't say anything at first. I saw the dog. He said, 'I have been to your house.' I said, 'I would not like to go in anybody's house when no one was there.' I asked him what reason he had to go to my house. He said, *'I will tell you something, but if you tell anybody I will get you before the sheriff gets me.'* He said, 'I expect Skidmore Nichols is at your house dead, but if you tell it I will get you before the sheriff gets me.' I could not do anything. He said to stay with him. I went on with him. We went to Mr. Godwin's and hailed. I had never been to Mr. Godwin's before. Some young man came to the door and Mr. Perry asked about carrying us home. He said he didn't have enough gas to get us there and back and finally he said his car was out of shape. . . . He told me he killed Skidmore Nichols. He said, 'Old man Nichols threw up his hands and said, 'Mr. Perry, please don't kill me, please don't.' "

L. B. Rhodes, an expert witness, testified in part: "I found some splotches on this hat. Q. Did you make an examination of those splotches to determine whether or not they were blood? Ans.: Yes, sir, the splotches on the hat of Mr. Charles Perry were identified as blood.

I didn't make an examination for the determination of human blood. I found a stain on the brim and another stain on the band of the hat. Those I identified as blood. . . . Q. Did you examine the shirt I hand you, represented to be the shirt of Charles Perry? Ans.: Yes. There were splotches on the shirt on the back of the collar here on the collar at the back and some on the front. Some blood stains were on the front. They were the ones cut out. There was blood both on the back and on the front. Q. Did you examine the splotches found on the overalls? Ans.: I also found blood stains on the overalls."

James H. Mitchell, deputy sheriff, testified in part: "I am a deputy sheriff and went to the home of Joseph Terry where the body of Skidmore Nichols was found. I found several pieces of skull on the floor. I have a piece of the skull. Yes, sir, that is a piece of the skull of Mr. Nichols I found there. It was lying about 3 feet from his body on the side next to the road from where he was lying. I saw a number of shot inside or at the top of the room in which Mr. Nichols' body lay, on the opposite side of the house from the dirt road. The room don't face on the dirt road. It faces on a little porch. It was from that door to the back side of the house on the opposite side of that. . . . Shot ranged upwards and struck the ceiling. There were several shot in the ceiling."

J. W. Hampton testified in part: "On Saturday night, 14 September, I left Winton to go home around 20 minutes to 11 o'clock. . . . When I got in about 300 or 400 yards of this side of my home I met Mr. Perry and Mr. Terry walking along the road towards Union. They did not have a dog with them at that time. I got home around 11 o'clock, in 3 or 4 minutes after I left them. . . . When I met these men on the road coming to Winton they did not have a gun with them. If they had had a gun I could have easily seen it. The moon was shining and I was riding along slow. I know both of them when I see them."

Annie Wiggins testified in part: "I and my husband live in the house on the right just after you leave the highway going towards the house in which Mr. Nichols was found dead. It is in sight and in hollering distance. On the Saturday night of 14 September, I passed by the house in which Mr. Nichols' body was found the next day. My husband was with me. It was 20 minutes past 12 o'clock. . . . After we got home I saw some men pass our house going towards the house in which Mr. Nichols' body was found. . . . Just about the time it took the men to walk from up there down to Mr. Terry's house I heard a gun fire. Just as soon as the gun fired a hollering took place. . . . I got out of the window, cracked the door and stood there about an hour. They came towards Winton. They came down the dirt road and went

up towards the highway. Yes, I know where Cofield is. They were going towards Cofield. Mr. Skidmore Nichols came to our house Saturday afternoon. When he left our house he went back towards Mr. Terry's house, where he was found dead. There were two of the men." There was other evidence on the part of the State.

In the main opinion is the following: "Whenever there is any evidence or when any inference can be fairly deduced therefrom tending to show a lower grade of murder, it is the duty of the trial judge, under appropriate instructions, to submit that view to the jury."

The defendant did not testify, but his plea was "Not guilty." The evidence, I think, on the part of the State showed that whoever did the killing, did it with premeditation and deliberation, and there was no evidence tending to show a lower degree.

N. C. Code, 1935 (Michie), sec. 4200, is as follows: "A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary, or other felony, shall be deemed to be murder in the first degree and shall be punished with death. All other kinds of murder shall be deemed murder in the second degree, and shall be punished with imprisonment of not less than two nor more than thirty years in the State prison."

Under the statute, the murder to be in the first degree must be a willful, deliberate, and premeditated killing, and this must be shown by the State beyond a reasonable doubt before it is justified in asking a verdict of guilty of murder in the first degree.

All the authorities are to the effect: Premeditation means "thought of beforehand," for some length of time, however short. Deliberation means a preconceived intent to kill, executed in cold blood, in furtherance of a fixed design to gratify a feeling of revenge or to accomplish some unlawful purpose, and not under the influence of a violent passion suddenly aroused by some lawful or just cause or legal provocation. And before conviction for murder in the first degree can be had, the State must show that the prisoner has formed, prior to the killing, with deliberations and premeditations, a purpose to kill deceased. Where a conspiracy is formed and murder is committed by one of the conspirators in the attempt to perpetrate the crime, each conspirator is guilty of murder in the first degree. Murder in the second degree is the unlawful killing of a human being with malice, but without elements of premeditation and deliberation.

In *S. v. Spivey,* 151 N. C., 676 (686), is the following: "It becomes the duty of the trial judge to determine, in the first instance, if there is any evidence or if any inference can be fairly deduced therefrom tend-

ing to prove one of the lower grades of murder. This does not mean any fanciful inference tending to prove one of the lower grades of murder; but, considering the evidence 'in the best light' for the prisoner, can the inference of murder in the second degree or manslaughter be fairly deduced therefrom." *S. v. Newsome,* 195 N. C., 552, is to the same effect.

I have set forth the evidence copiously, as I can see no evidence and cannot see any inference that can be fairly deduced therefrom tending to prove a lower grade of murder.

(1) *How was the deceased shot?* With a shotgun. There were no scars on the dead man, Skidmore Nichols, "except where the load carried his skull clean off." The load "entered in the back and took the whole top of it off clean. . . . He was shot from a lower angle, . . . blood and pieces of flesh, brains and part of the hair were blown up in the ceiling of the room." "The back part of his head was shot off." No "sign or marks of violence on the body of the deceased, besides the shot in the head." James H. Mitchell testified: "Shots ranged upwards and struck the ceiling."

(2) *Who did the shooting?* Defendant told the sheriff that "Joseph Terry told him he was going out and kill Skidmore Nichols. He went with him and Terry again told him, "He was going to kill old man Skidmore Nichols." They stopped in front of the house. "Terry went around the house and in a few minutes he heard a gun fire and in a few more minutes he saw Terry come out and Terry said, 'Old man Skidmore Nichols is out of the way.'" Joseph Terry said that defendant told him, "I expect Skidmore Nichols is at your house dead, but if you tell it I will get you before the sheriff gets me." "He told me he killed Skidmore Nichols. He said, 'Old man Nichols threw up his hands and said, "Mr. Perry, please don't kill me, please don't."' "

(3) *Threats made:* 1. He (defendant) told Jeffrey Brown when he was on the county farm that the sheriff had caught him in bed with Nichols' wife and after he left the farm "he was going to kill Skidmore for causing all this trouble." 2. Odelia Terry testified that as Skidmore Nichols passed by the house of Malissa Nichols, wife of Skidmore Nichols, defendant was there and said "he was going to kill him," called him a "damn rascal or scoundrel." 3. J. E. Brady testified that defendant said "he didn't feel he would ever die satisfied if he couldn't run his arm down Skidmore Nichols' throat and pull his heart out of him." 4. Charles Terry testified before defendant was tried and sent to the roads he said that "he was going to kill the s—— of a b—— if he ever got free."

In the *Newsome case, supra* (p. 559), the defendant told Dr. Linville: "I asked him what caused him to do this, and he said, 'I don't know.'

I asked him if he cut the girl immediately after he came up with her. He said he did not; that he seized her around the waist, and she fought him off and ran from him. He said that he cut her after he caught up with her; that he cut her because she said she was going to tell her father." As I understand the main opinion in that case, this was some evidence on the question of murder in the second degree. In that case the Court said (p. 564): "Deliberation and premeditation, if relied upon by the State, as constituting the homicide murder in the first degree, under the statute, must always be proved by the evidence, beyond a reasonable doubt. In such case, under the statute as construed by this Court, it is for the jury and not the judge to find the fact of deliberation and premeditation, from the evidence, and beyond a reasonable doubt. Premeditation and deliberation are always matters of fact to be determined by the jury, and not matters of law to be determined by the judge."

In the present case, if the defendant did the killing or aided and abetted or conspired with Joseph Terry to do the killing, in either aspect he would be guilty on the evidence in this case of murder in the first degree. The jury found that defendant did the killing with premeditation and deliberation. The court below charged the jury clearly and correctly on the law applicable to the facts. On the evidence, if defendant killed or aided or conspired in the killing, it was murder in the first degree. The evidence was not circumstantial, but direct, that the deceased was shot in the back of the head and his skull shot off. He was shot from a lower angle and blood, flesh, brains, and parts of his hair were blown to the ceiling of the room, and the cry went up from the dead man, when he threw up his hands: "Mr. Perry, please don't kill me, please don't."

The record discloses a horrible crime, for which the jury has convicted defendant of murder in the first degree, and I can see no error in the record. Defendant took deceased's wife and was convicted and imprisoned for the crime. He made threat after threat that he was going to kill deceased, and did kill him—shooting him from behind—taking the top of his head off; or conspired with or aided and abetted Joseph Terry in killing him in the manner before described. He was found the day after the night of the killing lying on his bed in his home in his bloody clothes, bits of flesh and pieces of hair on the apron of his overalls—his paramour, deceased's wife, was with him on the bed.

The evidence is to the effect that he filled up on whiskey before the foul deed was done.