IN THE SUPREME COURT OF NORTH CAROLINA

No. 187A22

Filed 15 December 2023

STATE OF NORTH CAROLINA

v.

JAHZION WILSON


Appeal pursuant to N.C.G.S. § 7A-30(2) (2021) from the decision of a divided

panel of the Court of Appeals, 283 N.C. App. 419, 873 S.E.2d 41 (2022), finding no

error after an appeal from a judgment entered on 13 June 2019 by Judge Forrest D.

Bridges in Superior Court, Mecklenburg County. Heard in the Supreme Court on 7

November 2023.

*Joshua H. Stein, Attorney General, by Marissa K. Jensen, Special Deputy Attorney General, for the State-appellee.*

*Glenn Gerding, Appellate Defender, by David W. Andrews, Assistant Appellate Defender, for defendant-appellant.*

NEWBY, Chief Justice.

In this case we consider whether the trial court properly denied defendant's

request for a jury instruction on second-degree murder as a lesser-included offense of

first-degree murder under the felony-murder theory. When the State charges a

defendant with first-degree murder only under the felony-murder theory, our cases

have held that the defendant may be entitled to a jury instruction on second-degree

murder as a lesser-included offense. But in such a scenario, the defendant is only

-1-

entitled to an instruction on second-degree murder if the evidence of the underlying felony is in conflict and the evidence would support second-degree murder. To create a conflict in the evidence supporting the underlying felony, a defendant must identify evidence other than his own statements denying his involvement in the criminal offense. In the present case, we conclude that there is not a conflict in the evidence supporting the underlying felony of attempted robbery with a dangerous weapon. Accordingly, defendant was not entitled to an instruction on second-degree murder. The decision of the Court of Appeals is modified and affirmed.

On 16 January 2018, defendant was indicted for attempted robbery with a dangerous weapon, conspiracy to commit robbery with a dangerous weapon, and first-degree murder. Regarding the first-degree murder charge, the State proceeded solely on a theory of felony murder based on attempted robbery with a dangerous weapon.

At trial the State's evidence tended to show the following. On 18 June 2017, which was Father's Day, officers from the Charlotte-Mecklenburg Police Department responded to a shooting and potential robbery at the Arbor Glen Apartments in Charlotte, North Carolina. According to officer testimony, the officers found Zachary Finch deceased from a gunshot wound with approximately two hundred dollars of loose cash and a bloodied iPhone on or near his body. Although officers did not locate either the firearm or the discharged bullet, they found a shell casing at the scene of the crime. The forensic pathologist and medical examiner confirmed that Finch was

killed by a gunshot wound. At that time, however, the officers did not identify any suspects.

Later that day, officers learned from Finch's parents that Finch had arranged to purchase a cell phone via the "LetGo" app. According to Finch's mother, Finch was supposed to purchase the cell phone from "a dad with his two kids." The officers subsequently obtained records from LetGo, however, and they eventually discovered that Finch had arranged to buy the cell phone from defendant.

Officers interviewed defendant, who was fifteen years old at the time, on 20 July 2017, and the State entered a transcript and recording of that interview into evidence. Notably, defendant did not testify at his trial, and this interview is the only account of the incident from defendant's perspective.

According to defendant's statements to the interviewing officer, defendant had arranged to sell a cell phone to Finch through LetGo. Defendant recounted that after agreeing with Finch to meet at the Arbor Glen Apartments, he went to meet Finch with his friends, "Tink" and Demonte "Monte" McCain.[1] Defendant explained that because he did not know Finch, and because he had experienced bad transactions in the past, defendant "didn't really trust [the transaction]." As such, defendant told the interviewing officer that he asked Tink to speak with Finch. In exchange, defendant

---

[1] The evidence tended to show that Monte was not part of any arrangement with defendant and/or Tink. In fact, defendant expressly stated to the interviewing officer that "[Monte] was never in"—i.e., Monte was never part of the arrangement. Rather, according to defendant's statements, Monte coincidentally was in the area at this time.

said that he promised to "break[ ] [Tink] off" sixty dollars—that is, to give Tink a portion of the money he received. Defendant stated that when Finch arrived, Finch spoke with Tink about the price of the cell phone and the SIM card. According to defendant, however, after Tink and Finch spoke for several minutes, the "deal went wrong." Defendant recounted that Tink pointed a gun at Finch, who turned to run away because "he was fixin[g] to get robbed by . . . Tink." Defendant stated that Tink shot one time, striking and killing Finch. Defendant then told the interviewing officer that after the incident, he, Tink, and Monte ran to Tink's sister's house.

Throughout the police interview, the interviewing officer asked defendant several times if he knew that Tink went to the transaction armed with a firearm. Defendant initially denied it, but he eventually admitted to the interviewing officer that, prior to the meeting with Finch, he knew Tink was bringing a gun to the meeting. Similarly, the interviewing officer asked defendant if he brought a firearm to the meeting with Finch. Again, defendant initially denied that he brought a firearm, but he eventually admitted to bringing one of Tink's guns with him. Defendant also stated that Monte brought a firearm to the transaction.

Additionally, the interviewing officer asked defendant whether he was going to actually sell Finch the cell phone. Defendant maintained that he planned to sell the cell phone, but he also revealed to the interviewing officer that Tink had proposed robbing Finch. Defendant said that he tried to dissuade Tink, telling him, "[Y]ou ain't got to rob him just sell him the phone." But when the interviewing officer asked if he

knew that Tink was going to rob Finch, defendant replied, "I didn't know for sure if [Tink] was gonna rob him[,] but he had talked about it, yes." Defendant clarified, however, that there was no plan to shoot Finch.

In addition, the State called Ashanti Gatewood, who was defendant's girlfriend in the summer of 2017, to testify. Gatewood testified that defendant called her after the events of 18 June 2017 and told her that "he just shot and robbed somebody." The State also called defendant's friend, Travis Moore, to testify. Two portions of Moore's testimony are pertinent to this appeal. First, Moore testified that defendant planned to buy a cell phone, not sell one. Second, Moore testified that defendant told him "that he killed somebody around . . . Father's Day."

Defendant did not put on any evidence at trial. Prior to the jury charge, however, defendant requested that the trial court instruct the jury on second-degree murder as a lesser-included offense of first-degree murder. The trial court denied defendant's request and instructed the jury on first-degree murder under the felony-murder theory, attempted robbery with a dangerous weapon, and conspiracy with Monte to commit robbery with a dangerous weapon. The trial court further instructed the jury that it could find defendant had committed the criminal acts himself or by acting in concert with another. The jury found defendant guilty of attempted robbery with a dangerous weapon and first-degree murder based upon the

felony-murder rule.[2]

On appeal, defendant argued, among other things, that the trial court erred by failing to instruct the jury on second-degree murder as a lesser-included offense of first-degree murder. *State v. Wilson*, 283 N.C. App. 419, 421, 873 S.E.2d 41, 44 (2022). The Court of Appeals' majority found no error in defendant's trial. It relied on this Court's statement in *State v. Gwynn* that "when the [S]tate proceeds on a first-degree murder theory of felony murder only, the trial court must instruct on all lesser-included offenses if the evidence of the underlying felony supporting felony murder is in conflict and the evidence would support a lesser-included offense of first-degree murder." 362 N.C. 334, 336, 661 S.E.2d 706, 707 (2008) (internal punctuation omitted) (quoting *State v. Millsaps*, 356 N.C. 556, 565, 572 S.E.2d 767, 773 (2002)), *construed in Wilson*, 283 N.C. App. at 435–38, 873 S.E.2d at 51–53. Focusing on the second part of the test, the Court of Appeals' majority concluded that defendant was not entitled to a second-degree murder instruction because "there [was] no evidence in the record from which a rational juror could find [d]efendant guilty of second-degree murder and not guilty of felony murder." *Wilson*, 283 N.C. App. at 436, 873 S.E.2d at 52 (determining that whether the evidence supporting the underlying felony was in conflict was "irrelevant").

The dissent, in contrast, relied on this Court's statement in *Gwynn* that "the

---

[2] The jury acquitted defendant of conspiracy with Monte to commit robbery with a dangerous weapon.

trial court should not instruct on lesser-included offenses if the evidence as to the underlying felony supporting felony murder is not in conflict and all the evidence supports felony murder." 362 N.C. at 336, 661 S.E.2d at 707 (internal punctuation omitted) (quoting *Millsaps*, 356 N.C. at 565, 572 S.E.2d at 774), *construed in Wilson*, 283 N.C. App. at 440–44, 873 S.E.2d at 55–57 (Stroud, C.J., concurring in part and dissenting in part). The dissent reasoned that if *any* evidence supported the contention that defendant did not attempt to rob Finch, then defendant was entitled to an instruction on second-degree murder as a lesser-included offense. *Wilson*, 283 N.C. App. at 442, 873 S.E.2d at 56. According to the dissent, defendant's statements that he intended to sell the phone and not rob Finch amounted to "conflicting evidence" that "present[ed] a question of credibility and weight of the evidence [that] must be resolved by a jury."[3] *Id.* at 443, 873 S.E.2d at 56. The dissent also reasoned that the error was prejudicial notwithstanding defendant's conviction of attempted robbery with a dangerous weapon because, in essence, the jury's only options were to convict or acquit defendant outright. *Id.* at 444–45, 873 S.E.2d at 57. Defendant

---

[3] The dissent at the Court of Appeals emphasized that defendant was acquitted of a conspiracy to commit robbery with a dangerous weapon, stating "it appear[ed] the jury believed at least some of defendant's account of events or was not fully convinced by the State's evidence regarding a plan to commit robbery." *Id.* at 443–44, 873 S.E.2d at 57. The dissent at this Court also adopts this reasoning. We note, however, that the conspiracy charge alleged a conspiracy between defendant and Monte, who does not appear to have been a part of the arrangements between defendant and Tink. Therefore, defendant's acquittal of the conspiracy charge with Monte does not inform whether defendant and Tink planned to rob Finch.

appealed to this Court based on the dissent at the Court of Appeals.[4]

The issue here is whether the Court of Appeals erred in holding that defendant was not entitled to an instruction on second-degree murder. We review decisions of the Court of Appeals for errors of law. *State v. Brooks*, 337 N.C. 132, 149, 446 S.E.2d 579, 590 (1994). When determining whether the evidence is sufficient for the submission of a lesser-included offense, we view the evidence in the light most favorable to the defendant. *State v. Barlowe*, 337 N.C. 371, 378, 446 S.E.2d 352, 357 (1994).

"[A] defendant is entitled to have all lesser degrees of offenses supported by the evidence submitted to the jury as possible alternate verdicts." *State v. Palmer*, 293 N.C. 633, 643–44, 239 S.E.2d 406, 413 (1977). When determining whether a defendant is entitled to an instruction on a lesser-included offense, the first determination is "whether the lesser offense is, as a matter of law, an included offense of the crime for which [the] defendant is indicted." *State v. Thomas*, 325 N.C. 583, 590, 386 S.E.2d 555, 559 (1989). Then the court must determine whether the evidence supports a conviction of the lesser-included offense. *Id.* at 591, 386 S.E.2d at 559. Specifically, when the State charges first-degree murder but proceeds only under the felony-murder theory, the trial court must instruct on all lesser-included offenses if

_____

[4] *See* N.C.G.S. § 7A-30(2) (2021), *repealed by* Current Operations Appropriations Act of 2023, S.L. 2023-134, § 16.21(d), https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2023-2024/SL2023-134.pdf. The repeal of N.C.G.S. § 7A-30(2) only applies to cases filed with the Court of Appeals on or after 3 October 2023. *See* Current Operations Appropriations Act § 16.21(e).

(1) the evidence supporting the underlying felony is "in conflict," and (2) the evidence would support a lesser-included offense of first-degree murder. *Gwynn*, 362 N.C. at 336, 661 S.E.2d at 707 (quoting *Millsaps*, 356 N.C. at 565, 572 S.E.2d at 773).

For evidence to be "in conflict," there must be evidence that tends to negate the State's positive evidence as to the elements of the crime. *Thomas*, 325 N.C. at 594, 386 S.E.2d at 561. "Such conflicts may arise from evidence introduced by the State, or the defendant. They may [also] arise when only the State has introduced evidence." *Id.* (citations omitted). In order to identify a conflict in the evidence, however, the defendant must rely on more than his own statements denying his involvement in the crime. *See, e.g., State v. Strickland*, 307 N.C. 274, 293, 298 S.E.2d 645, 658 (1983), *overruled on other grounds by* 317 N.C. 193, 344 S.E.2d 775 (1986); *State v. Thomas*, 350 N.C. 315, 347, 514 S.E.2d 486, 506 (1999). Indeed,

> [t]he determinative factor is what the State's evidence tends to prove. If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree . . . and there is *no evidence to negate these elements other than defendant's denial that he committed the offense*, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.

*Millsaps*, 356 N.C. at 560, 572 S.E.2d at 771 (emphasis added) (quoting *Strickland*, 307 N.C. at 293, 298 S.E.2d at 658). Because "the underlying felony constitutes an element of first-degree murder" when the State proceeds under the felony-murder theory, *id.* at 560, 572 S.E.2d at 770, the same standard applies when considering if

there is a conflict in the evidence of the underlying felony.[5]

If there is a conflict in the evidence supporting the underlying felony, the evidence must then also support a lesser-included offense of first-degree murder. *Gwynn*, 362 N.C. at 336, 661 S.E.2d at 707. To warrant a lesser-included offense instruction, the evidence must "permit the jury *rationally* to find defendant guilty of the lesser offense and to acquit him of the greater." *Millsaps*, 356 N.C. at 561, 572 S.E.2d at 771 (emphasis added). When the State charges first-degree murder but proceeds only under the felony-murder theory, the "defendant is entitled to a second-degree murder instruction only if evidence also tend[s] to show that the murder was not committed in the course of the commission of a felony." *State v. Wilson*, 354 N.C. 493, 506, 556 S.E.2d 272, 281 (2001), *overruled on other grounds*, 356 N.C. at 567, 572 S.E.2d at 775.

If there is a conflict in the evidence and the evidence supports an instruction

---

[5] Contrary to the dissent's assertion, this rule does not clash with *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382 (1980). There, the United States Supreme Court observed how the defendant's statements contradicted the State's evidence. *Id.* at 629–30, 100 S. Ct. at 2385–86. It then made this observation: "As the State has conceded, absent the statutory prohibition on such instructions, this testimony would have entitled petitioner to a lesser included offense instruction on felony murder *as a matter of state law*." *Id.* at 630, 100 S. Ct. at 2386 (emphasis added); *see also id.* at 630 n.5, 100 S. Ct. at 2386 n.5. Read in context, the Court's statement was not a declaration of a universal rule applicable to all states. Rather, it was simply a summary of Alabama's law and how it applied to the facts of that case. As the Court itself observed, "the [s]tates vary in their descriptions of the quantum of proof necessary to give rise to a right to a lesser included offense instruction," *id.* at 636 n.12, 100 S. Ct. at 2389 n.12, and it did not purport to hold that a defendant is always entitled to a lesser-included offense instruction when his statements contradict the State's evidence. Therefore, nothing in *Beck* casts doubt on this Court's rule that a defendant must identify more than his own statements denying his involvement in a crime to create a conflict in the evidence.

on a lesser-included offense, the trial court must give an instruction on the lesser-included offense. *Gwynn*, 362 N.C. at 336, 661 S.E.2d at 707. With these principles in mind, we turn to the present case.

We start by describing the relevant crimes. As noted, defendant was tried for first-degree murder under the felony-murder theory with attempted robbery with a dangerous weapon as the underlying felony. Defendant insists he was entitled to an instruction on second-degree murder as a lesser-included offense.

"The crime is first-degree murder," and felony murder is a theory that the State may use to pursue a conviction. *Millsaps*, 356 N.C. at 560, 572 S.E.2d at 770. Felony murder is a murder "committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, *robbery*, kidnapping, burglary, or *other felony committed or attempted with the use of a deadly weapon*." N.C.G.S. § 14-17(a) (2021) (emphasis added). *See generally State v. Juarez*, 369 N.C. 351, 354, 794 S.E.2d 293, 297 (2016) (observing that the felony-murder theory is "the legislature's deliberate policy choice to hold individuals accountable for deaths occurring during the commission of felonies, regardless of whether the murder was intentional or unintentional" (internal quotation marks omitted) (quoting *State v. Bell*, 338 N.C. 363, 386, 450 S.E.2d 710, 723 (1994))).

In this case, attempted robbery with a dangerous weapon is the felony underlying felony murder. Under our laws, if an individual intends to commit a crime and performs an overt act beyond mere preparation for that purpose but falls short

of completing the criminal offense, he is guilty of attempting the crime. *State v. Melton*, 371 N.C. 750, 756, 821 S.E.2d 424, 428 (2018). Specifically, "[a]n attempted robbery with a dangerous weapon occurs when a person, with the specific intent to unlawfully deprive another of personal property by endangering or threatening his life with a dangerous weapon, does some overt act calculated to bring about th[at] result." *State v. Allison*, 319 N.C. 92, 96, 352 S.E.2d 420, 423 (1987); *cf.* N.C.G.S. § 14-87(a) (2021) (criminalizing robbery with a firearm or other dangerous weapon).

Second-degree murder is "the unlawful killing of a human being with malice but without premeditation and deliberation." *State v. Thibodeaux*, 352 N.C. 570, 582, 532 S.E.2d 797, 806 (2000) (quoting *State v. Flowers*, 347 N.C. 1, 29, 489 S.E.2d 391, 407 (1997)); *see also* N.C.G.S. § 14-17(b) (2021). Malice may be established in several ways: (1) express hatred, ill-will, or spite; (2) commission of an inherently dangerous act in such a reckless and wanton manner as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief; or (3) a condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification. *State v. Coble*, 351 N.C. 448, 450–51, 527 S.E.2d 45, 47 (2000). Malice may also be established by the use of a deadly weapon to inflict a wound that proximately results in death. *Id.* at 451, 527 S.E.2d at 47.

For each of these offenses, "[h]e who actually perpetrates the crime . . . by his own hand" is guilty of the crime. *State v. Small*, 301 N.C. 407, 412, 272 S.E.2d 128, 132 (1980), *superseded in part by statute*, An Act to Abolish the Distinction Between

Accessories Before the Fact and Principals and to Make Accessories Before the Fact Punishable as Principal Felons, ch. 686, § 1, 1981 N.C. Sess. Laws 984, 984 (codified as amended at N.C.G.S. § 14-5.2). But furthermore, a person may be guilty if he "acts in concert" with the crime's principal perpetrator. *Id.* Indeed,

> [i]f two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose or as a natural and probable consequence thereof.

*State v. Barnes*, 345 N.C. 184, 233, 481 S.E.2d 44, 71 (1997) (internal punctuation omitted) (quoting *State v. Erlewine*, 328 N.C. 626, 637, 403 S.E.2d 280, 286 (1991)). In other words, a person who works together with another to bring about a criminal objective may be convicted of the same crime as the one who actually perpetrates the criminal act.

Although sharply divided, this Court ruled that, as a matter of law, second-degree murder is a lesser-included offense of first-degree murder, even when the State proceeds under the felony-murder theory. *Thomas*, 325 N.C. at 592–93, 386 S.E.2d at 560. This Court did so despite second-degree murder having essential elements that are not essential elements of first-degree murder when pursued under the felony-murder theory. *See id.* at 600–05, 386 S.E.2d at 564–68 (Mitchell, J., dissenting) (reasoning that, under a definitional test, second-degree murder is not a lesser-included offense of first-degree murder when pursued under the felony-murder theory because it has two different essential elements: (1) malice and (2) an

-13-

intentional act that proximately causes the victim's death). Nevertheless, because the dissent below did not draw this holding into question and the State did not seek discretionary review, we turn our attention to the issue at hand: whether, under *Gwynn*, the evidence supported a second-degree murder instruction in this case. *See* N.C. R. App. P. 16(b) ("When the sole ground of the appeal of right is the existence of a dissent in the Court of Appeals, review by the Supreme Court is limited to a consideration of those issues that are . . . specifically set out in the dissenting opinion as the basis for that dissent . . . .").

Under the framework set out in *Gwynn*, we must first determine if the evidence of the underlying felony of attempted robbery with a dangerous weapon is "in conflict." *Gwynn*, 362 N.C. at 336, 661 S.E.2d at 707. At the outset, we note that the State presented positive evidence as to each element of attempted robbery with a dangerous weapon. First, the evidence showed that defendant and Tink discussed the idea of robbing Finch before meeting him. Defendant and Tink also agreed to split the money between them. Thereafter, defendant armed himself with one of Tink's weapons, and both he and Tink went armed with firearms to meet Finch. Defendant's statements indicated that Tink pointed his gun at Finch at the meeting in order to rob him. Furthermore, Gatewood's testimony that defendant admitted to "sho[oting] and robb[ing] somebody" and Moore's testimony that defendant admitted to "kill[ing] somebody" suggest that defendant was personally involved in the attempted robbery with a dangerous weapon. Defendant, however, proffers three arguments as to why

the evidence is in conflict. Each is unavailing.

First, defendant insists that Travis Moore's statement that defendant planned to buy a cell phone, not sell one, creates a conflict in the evidence. Defendant, however, does not explain how this discrepancy creates a conflict in the evidence supporting attempted robbery with a dangerous weapon. At most, it creates a conflict as to what object of Finch's personal property may have been the target of the attempted robbery: his money or his cell phone. Even viewing this discrepancy in the light most favorable to defendant, we hold that it does not negate any element of attempted robbery with a dangerous weapon, and therefore it does not create a conflict in the evidence.

Second, defendant argues that the loose cash found on or near Finch's body creates a conflict in the evidence. According to defendant, this fact suggests that defendant did not have the specific intent to rob Finch. This argument, however, ignores the fact that attempted robbery with a dangerous weapon is an inchoate crime, meaning the attempted crime is not completed. *Inchoate*, *Black's Law Dictionary* (11th ed. 2019) (defining "inchoate" as "[p]artially completed or imperfectly formed; just begun"). Defendant therefore did not need to complete the robbery to be guilty of attempted robbery with a dangerous weapon. Thus, the presence of the cash on or near the victim's body does not negate evidence that defendant attempted to rob Finch with a dangerous weapon, and therefore it does not create a conflict in the evidence.

Third, defendant's principal argument is that his statements that he planned to sell his cell phone rather than rob Finch create a conflict in the evidence supporting the underlying felony of attempted robbery with a dangerous weapon. This Court's precedents foreclose defendant's argument. *E.g.*, *Millsaps*, 356 N.C. at 560, 572 S.E.2d at 771; *Thomas*, 350 N.C. at 347, 514 S.E.2d at 506 ("[T]he only evidence offered by defendant to negate first-degree murder was his own testimony denying his involvement in the crime, *which alone does not tend to negate premeditation and deliberation*." (emphasis added)).[6] Defendant's statements that he planned to sell the cell phone and not rob Finch are, in essence, the same as a denial that he was involved in Tink's scheme to rob Finch. Therefore, his statements alone do not create a conflict in the evidence supporting attempted robbery with a dangerous weapon.

Defendant, however, invites this Court to distinguish *Thomas*, arguing that case involved a "blanket denial of guilt" whereas "[his] statements were far more than mere denials." According to defendant, "his statements negated a specific element of the State's theory of acting in concert." We do not agree. In *Thomas*, the defendant was charged with first-degree murder based on premeditation and deliberation and the felony-murder theory. 350 N.C. at 325, 514 S.E.2d at 493. The defendant, who testified at trial and admitted to being at the victim's home on the night of the

---

[6] Although there are cases from this Court where we found that a defendant's statements generated a conflict in the evidence, *see, e.g.*, *Thomas*, 325 N.C. at 595–98, 386 S.E.2d at 562–63; *State v. Camacho*, 337 N.C. 224, 231–33, 446 S.E.2d 8, 12–13 (1994), those cases were abrogated by our subsequent holdings in *Thomas*, 350 N.C. at 347, 514 S.E.2d at 506 (1999), and *Millsaps*, 356 N.C. at 560, 572 S.E.2d at 771 (2002).

murder, gave a detailed account of the night's events. *Id.* at 327, 514 S.E.2d at 494. According to his testimony, the defendant drove another individual "to a 'white dude's house' to settle a drug debt." *Id.* The defendant stated, however, "that when he left the house . . . , [the other individual] stayed behind, and [the victim] was still alive." *Id.* Clearly, the defendant's statements in *Thomas* were far more than "blanket denials of guilt." Thus, the holding in *Thomas* is applicable to the present case.

Because there was not a conflict in the evidence, we need not proceed to the next step of the *Gwynn* analysis to consider whether the evidence would support a lesser-included offense of first-degree murder. Defendant was not entitled to an instruction on second-degree murder as a lesser-included offense. Therefore, the trial court did not err in refusing to give the jury an instruction on second-degree murder. The decision of the Court of Appeals is modified and affirmed.

MODIFIED AND AFFIRMED.

Justice EARLS dissenting.

Under deep-seated principles and long-standing precedent, a defendant is "entitled to have all lesser degrees of offenses supported by the evidence submitted to the jury as possible alternate verdicts." *State v. Palmer*, 293 N.C. 633, 643–44 (1977). We have minted special rules when the State prosecutes a defendant for first-degree felony murder. In those cases, a trial judge must instruct the jury on a lesser-included offense if (1) the evidence of the underlying felony is "in conflict" and (2) the evidence would support a lesser-included offense of first-degree murder. *State v. Gwynn*, 362 N.C. 334, 336 (2008).

The majority here stops after the first step. As it defines it, a conflict exists—and triggers a lesser-included offense instruction—if evidence "tends to negate the State's positive evidence as to the elements of the crime." But not all evidence counts, says the majority. More specifically, a defendant's "own statements denying his involvement in the criminal offense" do not raise a conflict in the evidence. Applying that rule to Mr. Wilson's case, the majority finds no evidentiary conflict that required a lesser-included offense instruction.

I disagree with the majority's artificially truncated rule. In practice, it threatens unfair and impractical results. It also clashes with the principles animating our lesser-included offense jurisprudence. In my view, the evidence was "in conflict" on Mr. Wilson's specific intent to rob Mr. Finch. *See id.* Because of that conflict, I would proceed to *Gwynn*'s second step and find that, since second-degree murder is a

lesser-included offense of first-degree murder, the trial court should have instructed jurors on that crime.

## I. What did the State need to prove to convict Mr. Wilson of first-degree felony murder?

To convict Mr. Wilson of felony murder—a species of first-degree murder—the State had to prove that Mr. Finch's "killing took place while the accused was perpetrating or attempting to perpetrate one of the enumerated felonies." *State v. Richardson*, 341 N.C. 658, 666 (1995). In this case, the "enumerated" felony was attempted robbery with a dangerous weapon. Attempted robbery is an inchoate crime—a defendant need not complete the offense to have committed it. Even so, the State had to prove that Mr. Wilson specifically intended to "unlawfully deprive" Mr. Finch of his "personal property by endangering or threatening his life with a dangerous weapon." *State v. Allison,* 319 N.C. 92, 96 (1987). Intent established, the State had to also show that Mr. Wilson performed an "overt act" beyond mere preparation that was "calculated to bring about" the planned crime. *Id.*

The parties focus on Mr. Wilson's specific intent to commit the underlying felony. For as this Court has explained, the intent element is central to felony murder. *See State v. Jones,* 353 N.C. 159, 166–69 (2000). A defendant "must be purposely resolved to commit" the predicate felony "to be held accountable for unlawful killings that occur during the crime's commission." *Id.* at 167; *see also id.* ("[T]he actual intent to kill may be present or absent; however, the actual intent to commit the underlying felony is required."). Culpable negligence is not enough—the State must prove that

"the defendant actually intended to commit" the predicate felony. *Id.* at 167–68. And so for Mr. Wilson, the State could not simply show that he acted recklessly or with "heedless indifference to the safety and rights of others." *Id.* at 165 (quoting *State v. Weston*, 273 N.C. 275, 280 (1968)) (defining criminal negligence). To commit attempted robbery, he had to be "purposely resolved" to taking Mr. Finch's personal property using a dangerous weapon. *Id.* at 167. And so if evidence cuts against Mr. Wilson's specific intent to commit armed robbery, it cuts against his guilt of the predicate felony and—by extension—felony murder.

**II.   When must a court instruct the jury on a lesser-included offense?**

Time and again, this Court has recognized a defendant's right "to have all lesser degrees of offenses supported by the evidence submitted to the jury as possible alternate verdicts." *Palmer,* 293 N.C. at 643–44; *State v. Thomas*, 325 N.C. 583, 594 (1989) (explaining that a lesser-included offense instruction is required if the evidence "would permit a jury rationally to find defendant guilty of the lesser offense and acquit him of the greater" (cleaned up)).

That rule flows from constitutional guarantees of due process. A judge's charge to the jury, we have explained, is "one of the most critical parts of a criminal trial." *State v. Walston*, 367 N.C. 721, 730 (2014). It provides jurors with a menu of choices, thus shaping whether, why, and for what they return a verdict. And so for "over a century," this Court has required judges to instruct the jury on "an included crime of lesser degree than that charged" if "there is evidence tending to support" it. *State v.*

*Brichikov*, 383 N.C. 543, 553 (2022) (quoting *State v. Hicks*, 241 N.C. 156, 160 (1954)); *see also State v. Jones*, 79 N.C. 630, 631 (1878) ("It was [defendant's] privilege to have the State's evidence applied to any theory justified by it. . . . This right he demanded in his prayer for instructions which ought to have been given.").

In practice, that safeguard "reduce[s] the risk of an unwarranted conviction." *State v. Conaway*, 339 N.C. 487, 514 (1995). And as the Supreme Court has explained, that danger is greatest when "one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense." *Beck v. Alabama*, 447 U.S. 625, 634 (1980) (quoting *Keeble v. United States*, 412 U.S. 205, 212–13 (1973)). A jury left with "only two options"—"convicting the defendant" or "acquitting him outright"—is "likely to resolve its doubts" by convicting the defendant. *Id*. Instructing jurors on a lesser-included offense provides a "third option." *Id*. And by affording "the jury a less drastic alternative than the choice between conviction of the offense charged and acquittal," *id*. at 633, the instruction thus "accord[s] the defendant the full benefit of the reasonable-doubt standard," *id*. at 634.

In light of those due process concerns, our cases do not set a high bar for lesser-included offense instructions. Before charging jurors, a trial court must ask whether "the State's evidence is positive as to each and every element of the crime charged." *Thomas*, 325 N.C. at 594 (cleaned up); *accord State v. Locklear*, 331 N.C. 239, 246 (1992). A judge may decline to instruct the jury on a lesser crime only if "there is *no* contradictory evidence relating to *any* element" of that offense. *Id*. (emphases added)

(citing *State v. Peacock*, 313 N.C. 554 (1985)).

But the calculus changes if "there is any evidence or if any inference can be fairly deduced therefrom, tending to prove one of the lower grades of murder." *State v. Spivey,* 151 N.C. 676, 686 (1909); *see also State v. Strickland*, 307 N.C. 274, 293 (1983), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 203–04 (1986). If so, the evidence is "in conflict." *Gwynn*, 362 N.C. at 336. And because that conflict raises a "risk of an unwarranted conviction," it requires a lesser-included offense instruction. *Conaway*, 339 N.C. at 514; *see also Beck,* 447 U.S. at 634–36.

This case focuses on when the evidence is "in conflict," and how a defendant may identify that factual discord. Analytically, that matters to Mr. Wilson. When the State charges a defendant with felony murder and there is a "conflict in the evidence regarding whether defendant committed the underlying felony," then the court must instruct jurors on "all lesser degrees of homicide charged in the indictment" and "supported by the evidence." *State v. Camacho*, 337 N.C. 224, 231 (1994).

Despite the majority's narrow formulation of a conflict, our precedent has adopted a more generous approach. A conflict exists "if any other evidence tended to negate" the elements of the charged crime "when viewed in the light most favorable to defendant." *Brichikov*, 383 N.C. at 554. So too is the evidence in conflict when it "permits more than one inference" as to an essential element. *State v. Leroux*, 326 N.C. 368, 378, *cert. denied*, 498 U.S. 871 (1990); *see also State v. Perry*, 209 N.C. 604, 606 (1936) ("Whenever there is any evidence or when any inference can be fairly

deduced therefrom tending to show a lower grade of murder, it is the duty of the trial judge, under appropriate instructions, to submit that view to the jury."); *State v. Gause*, 227 N.C. 26, 30 (1946) (requiring trial court to instruct on second-degree murder when "more than one inference may be drawn from the evidence in respect to lying in wait").

As detailed above, specific intent is an essential ingredient for first-degree murder. For felony murder, the State needed to prove that Mr. Wilson specifically intended—or "purposely resolved"—to commit the underlying felony. *See Jones,* 353 N.C. at 167. So a conflict exists—and a court must instruct on a lesser degree of homicide—if "any evidence" or "any inference. . . fairly deduced" from it cuts against Mr. Wilson's specific intent to commit attempted robbery with a dangerous weapon. *See Perry*, 209 N.C. at 606.

### III.   Was the evidence in conflict as to Mr. Wilson's specific intent to commit the underlying felony?

According to the majority, Mr. Wilson cannot show a conflict because the State "presented positive evidence as to each element of attempted robbery with a dangerous weapon." To support that claim, the majority surveys the State's evidence.

At trial, the majority recounts, prosecutors used Mr. Wilson's statements as evidence that he and Tink "discussed the idea of robbing [Mr.] Finch before meeting him." The State also showed that Mr. Wilson—wary about meeting with an unknown person—asked Tink to do the talking, promising him $60 from the sale. On the day of the meet-up, Mr. Wilson and Tink "went armed with firearms to meet Finch." At

the meeting, Mr. Wilson's statements suggested that Tink "pointed his gun" at Mr. Finch "in order to rob him." In the wake of the killing, the majority notes, Mr. Wilson's girlfriend testified that he admitted to "sho[oting] and robb[ing] somebody." Mr. Wilson's comments to a friend suggested, too, that he "was personally involved in the attempted robbery with a dangerous weapon." So according to the majority, the State "presented positive evidence" for each element of the underlying felony, including specific intent.

But that account omits key information. When officers interviewed him, Mr. Wilson stated at least seven times that he intended to *sell* his phone to Mr. Finch, not rob him. Though Tink floated the idea of a robbery, Mr. Wilson repeatedly shot it down. Regardless of Tink's half-baked designs, Mr. Wilson had no plan to rob Mr. Finch or help Tink do so. From Mr. Wilson's perspective, too, it was not unusual for him or Tink to carry guns. His statement suggests that Tink was always armed but seldom used his weapon. *See State v. Wilson*, 283 N.C. App. 419, 443 (2022) (Stroud, C.J., concurring in part and dissenting in part). At trial, a friend also testified that Mr. Wilson told him that he planned to buy a phone on the LetGo app. And at the crime scene itself, officers found the iPhone and loose cash near Mr. Finch's body. In his pockets, they discovered another $200.

Viewed in the light most favorable to Mr. Wilson, that evidence tends to negate Mr. Wilson's specific intent. It shows that Tink—not Mr. Wilson—was the only person who mentioned a robbery. It shows, too, that Mr. Wilson tried to dissuade Tink from

that course, insisting, "[Y]ou ain't got to rob him just sell him the phone." And it shows

that neither Mr. Wilson nor Tink took any money or property from Mr. Finch—the

alleged purpose of the meet-up—after the deal went south. Taken together, that

evidence undercuts Mr. Wilson's specific intent to commit the underlying felony. *Id.*

at 167. At worst, Mr. Wilson knew that Tink was armed and had "talked about"

robbing Mr. Finch. But he "didn't know for sure" if Tink would do so, and he had no

intent to assist Tink or commit the robbery himself. Culpable negligence is not

enough for felony murder. *Id.* Even if Mr. Wilson acted recklessly or with "heedless

indifference" to Mr. Finch's safety, the evidence—viewed in his favor—does not show

that he "purposely resolved" to commit the underlying felony. *See id.* at 165, 167.

## IV.    What are the problems with the majority's approach?

The majority avoids the conflicting evidence by scrubbing it from

consideration. A defendant's statements cannot themselves raise a conflict, the

majority holds. But that rule clashes with Supreme Court precedent. In *Beck,* like

this case, the defendant implicated himself in a robbery-turned-homicide. *Beck,* 447

U.S. at 629. But the defendant "consistently denied" that "he killed the man or that

he intended his death." *Id.* As the defendant told it, "he and an accomplice entered

their victim's home in the afternoon." *Id.* at 629–30. And after the defendant "seized

the man intending to bind him with a rope, his accomplice unexpectedly struck and

killed him." *Id.* at 630.

The defendant's testimony, according to the Court, was enough to require a

lesser-included offense instruction. *See id.* at 635–38. When the evidence shows that "the defendant is guilty of a serious, violent offense" but "leaves some doubt with respect to an element that would justify conviction" of a more serious crime, the failure "to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id.* at 637. The Court reaffirmed the guiding principle of that due-process safeguard: A "defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Id.* at 635 (quoting *Keeble,* 412 U.S. at 208). So the lodestar is not the precise source of the evidence but whether it raises a "doubt with respect to an element that would justify conviction" of a less-serious crime. *Id.* at 637.[1]

---

[1] The majority downplays the dissonance of its position with *Beck,* claiming that that decision did not declare "a universal rule applicable to all States," but provided "simply a summary of Alabama's law and how it applied to the facts of that case." In support of that point, it notes *Beck*'s observation that "[A]bsent the statutory prohibition on such instructions, this testimony would have entitled petitioner to a lesser included offense instruction on felony murder *as a matter of state law*." *Beck*, 447 U.S. at 360 (emphasis added).

The majority identifies the very same constitutional flaw with the challenged statute: That it precluded a lesser-included offense instruction when the evidence would warrant one. By doing so, the Court explained, the statute "interject[ed] irrelevant considerations into the factfinding process, diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime." *Id.* at 642. More specifically, the "unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished." *Id.*

While states may define crimes and the lesser-included offenses that comprise them, the due-process clause requires a lesser-included offense instruction when the evidence would support one. *See id.* at 635–37. Indeed, the Court underscored that point in the footnote the majority only partly cites. Reproduced in full, the opinion says: "Although the States vary in

This Court, too, has relied on a defendant's statements to find a conflict in the evidence. *See Camacho*, 337 N.C. at 232–33; *see also Thomas*, 325 N.C. at 597 (relying on defendant's statements to police officer as basis for finding a conflict in evidence about whether "defendant shared a common purpose or plan" to commit the underlying felony).[2] In *Camacho*, for instance, we reversed a conviction because the trial court refused to instruct jurors on second-degree murder. *See Camacho*, 337 N.C. at 232–33. We first asked whether the evidence was in conflict for any element of the first-degree murder charge. *See id.* In that case, the State prosecuted the defendant for homicide by lying in wait—a species of first-degree murder. *Id.* at 231. And at trial, the State's "evidence tend[ed] to show that the defendant hid in the victim's closet and waited for her to return to her room before jumping out of the closet and

---

their descriptions of the quantum of proof necessary to give rise to a right to a lesser included offense instruction, *they agree that it must be given when supported by the evidence.*" *Id.* at 636 n.12 (emphasis added). In Mr. Wilson's case, then, if evidence would support a second-degree murder conviction, *Beck* requires one. And by artificially narrowing the relevant evidence, the ruling here runs into the same constitutional problems that animated *Beck*: When there is "some doubt with respect to an element that would justify conviction" of a serious crime, denying jurors the "third option" impermissibly "enhance[s] the risk of an unwarranted conviction." *Id.* at 637.

[2] According to the majority, these cases were "abrogated" by our decisions in *Millsaps* and *Thomas*. But neither of those later rulings purported to change or "abrogate" our precedent. In fact, *Millsaps* repeatedly cited the very case that it (per the majority) did away with. *See Millsaps,* 356 N.C. at 560 (citing *State v. Thomas*, 325 N.C. 583, 593 (1989), when explaining "certain well-settled principles applicable to first-degree murder"); *id.* at 561 (citing *Thomas*, 325 N.C. 583); *id.* at 561–62 (citing *Thomas*, 325 N.C. at 594); *id.* at 565 (citing *Thomas*, 325 N.C. 583); *id.* at 569 (citing *Thomas*, 325 N.C. at 593). And at one point, *Millsaps* excerpted full paragraphs from that earlier decision, relying on its formulation of the rules governing lesser-included offense instructions. *See id.* at 561–62. On top of that, this Court's 2016 opinion in *Juarez* cited the "abrogated" decisions as good law. *See State v. Juarez*, 369 N.C. 351, 355–56 (2016). And just last year, this Court quoted one "abrogated" case with approval. *See Brichikov*, 383 N.C. at 557 (citing *Thomas*, 325 N.C. at 599).

assaulting her with a hammer, leading to her death." *Id.* at 232.

But the defendant's testimony, on the other hand, "tend[ed] to show he did not lie in wait for his victim." *Id.* He told jurors that "he was in the victim's room only to retrieve some personal belongings when he was overcome with 'head rushes' resulting from his excessive use of alcohol and cocaine." *Id.* When he stooped "to pick up some tools he had dropped," the victim entered the room and attacked "him with a knife." *Id.* During their struggle, the defendant struck the fatal blow with a hammer. *Id.*

Because the evidence pointed both ways, this Court concluded that it was "in conflict as to whether the crime was committed by lying in wait." *Id.* at 231. Although the "State's evidence tend[ed] to show that it was," the "defendant's evidence tend[ed] to show that it was not." *Id.* at 231. Because of that conflict, the "trial judge should have given the jury an instruction based upon any version of the crime supported by the evidence favorable to defendant." *Id.* at 232. In other words, we required that jurors have the option to consider and convict the defendant for "any version of the crime which did not involve lying in wait, and which is supported by other evidence and charged in the indictment." *Id.* (cleaned up). And since the defendant's statements showed "that he did not intend to kill the victim" but "did intend to beat the victim in the head with a hammer," a second-degree murder instruction was required. *Id.* at 232–33.

The majority skips past that precedent, rooting its rule in a distinct species of cases: Those in which a defendant—through statements or testimony—categorically

denies any role in the crime, without explanation. The majority, for instance, relies on *State v. Thomas,* 350 N.C. 315 (1999). In that case, the defendant requested a second-degree murder instruction, arguing that the evidence was in conflict about his premeditation. *See id.* at 346. The only basis for that conflict: The defendant's "own testimony denying his involvement in the crime." *Id.* at 347. We held that the defendant's wholesale disavowal of guilt did not, standing alone, "tend to negate premeditation and deliberation." *Id.* In *Millsaps*—also cited by the majority—we declined to find a conflict based on nothing "other than defendant's denial that he committed the offense." *State v. Millsaps,* 356 N.C. 556, 560 (2002) (cleaned up).

But those cases differ critically from this one. When a defendant disclaims any role in a crime, he disavows the conduct that makes up both the greater *and* lesser-included offenses. The defendant, in effect, contends that he engaged in no crime at all. And for that reason, his bare "denial that he committed the offense" does not support a lesser-included offense instruction. *See id.*; *see also Conaway,* 339 N.C. at 515 (declining to require a second-degree murder instruction when defendant pointed to no evidence negating premeditation and deliberation aside from his testimony "that he did not commit the murders").

The analysis changes when a defendant's statements do not categorically disclaim criminal culpability but instead contradict a discrete element of the charged crime—an element that separates a more serious offense from lesser-included ones. That defendant—unlike those in the cases cited by the majority—does not entirely

disavow his role in the events that make up the greater and lesser-included offenses. His words bear on *which* crime he committed, not on whether he committed a crime at all. When offered for that distinct purpose, a defendant's statements are not a naked "denial that he committed the offense." *Cf. Millsaps,* 356 N.C. at 560.[3]

That logic applies to Mr. Wilson's case. Unlike the defendants in the majority's cases, Mr. Wilson does not "deny[ ] his involvement in the crime" or disclaim any role in any offense. *Cf. Thomas,* 350 N.C. at 347. Just the opposite. His own words link him to Mr. Finch, the crime scene, and the crime. Mr. Wilson instead offers his statements to show a conflict in the evidence on a discrete point: His specific intent to commit an attempted armed robbery with a dangerous weapon. Put differently, Mr. Wilson's words call into question whether his intent matched the elements of second- versus first-degree felony murder.

In my view, Mr. Wilson's statements are key data points. The State admitted

---

[3] Per the majority, *State v. Thomas*, 350 N.C. 315 (1999), forecloses this argument because the defendant's statements in that case "were far more than 'blanket denials of guilt.'" But that conclusion does not follow from the majority's premises. In *Thomas*, the defendant admitted his presence at the victim's home on the night of the murder. *See id.* at 327. But according to the defendant, he left to go "settle a drug debt." *Id.* When he drove away from the house, he testified that the victim "was still alive." *Id.*

In other words, the defendant flatly denied his participation in the events comprising the murder charge. Though he conceded that he was at the victim's house that night, he insisted that he left before anything happened. *See id.* And because the defendant categorically disavowed his role in and proximity to the murder, his statements did not negate a discrete element of first-degree murder. While the majority flattens *Thomas* into a categorical rule, its own summary of that case distinguishes it from Mr. Wilson's. Unlike the defendant in *Thomas,* Mr. Wilson does not entirely remove himself from the events underlying the murder charge—he instead disputes whether he had the intent needed for first- versus second-degree murder. Thus, unlike the defendant in *Thomas,* Mr. Wilson's words bear on his *degree* of culpability rather than disclaiming any culpability at all.

them into evidence, read them to the jury, leaned on them to make its case, and addressed them during closing arguments. And since Mr. Wilson does not categorically disclaim any involvement in the crime but instead disputes his specific intent to commit first-degree felony murder, our precedent does not demand the rule the majority extracts from it.

On a practical level, the majority's approach also overlooks the nature of inchoate crimes. To commit an attempted robbery, Mr. Wilson did not need to go through with it. The crime was complete when the participants "purposely resolved" to rob Mr. Finch using a dangerous weapon, and overtly acted to that end. Specific intent is key. But specific intent is also notoriously difficult to ferret out. For many inchoate crimes, the participants themselves are the only ones with insight into whether, how, and why they pursued a course of conduct. And so the participants' statements and testimony will be the primary—often the only—evidence for and against their guilt.

Just look at the State's evidence here. To convict Mr. Wilson of attempted robbery, prosecutors admitted into evidence his statements to police and leaned on them to meet their burden. *Wilson*, 283 N.C. App. at 442 (Stroud, C.J., concurring in part and dissenting in part). They played his words to the jury, and even referenced them during closing arguments. *Id.* But though the State used Mr. Wilson's statements as evidence of his intent, the majority now bars Mr. Wilson from using those same statements to show a conflict on the same point.

In fact, the majority itself deploys that one-way ratchet. In finding no conflict in the evidence, the majority points to Mr. Wilson's comments. It notes that, as Mr. Wilson told officers, he and Tink "discussed the idea of robbing Finch before meeting him." It observes too that Mr. Wilson and Tink agreed to split the proceeds of the sale. And it cites Mr. Wilson's "statements" as evidence that "Tink pointed his gun at [Mr.] Finch at the meeting in order to rob him." So for the majority, Mr. Wilson's words work one way only—though the majority may use them as evidence of his guilt, Mr. Wilson cannot use them to question it. That "heads-I-win, tails-you-lose" approach flouts basic principles of fairness.

Finally, the majority ignores how Mr. Wilson's youth bears on his intent. At the time of the crime, Mr. Wilson was just fifteen years old. And as the Supreme Court has recognized, intent and age are closely intertwined. *See Miller v. Alabama*, 567 U.S. 460, 471–72 (2012). A child's criminal culpability is tempered by the "distinctive attributes of youth"—their "transient rashness, proclivity for risk, and inability to assess consequences." *Id.* at 472 (cleaned up). Chief Judge Stroud made a similar point below. Although a "reasonable adult considering the situation would likely know something more was going to occur than just selling the phone," Mr. Wilson "was not a reasonable adult." *Wilson*, 283 N.C. App. at 443 (Stroud, C.J., concurring and dissenting). He was an impulsive teenager "who plainly, throughout his statement, seemed to believe Tink could talk a big game, but he would not actually shoot anyone, even though he was armed." *Id.*

The jury was the proper body to weigh the conflicting evidence and assess whether and how Mr. Wilson's age mattered. And if instructed on second-degree murder, it may well have found that offense a closer fit to the facts. Indeed, we know that jurors did not fully swallow the State's version of events. In acquitting Mr. Wilson of conspiracy to commit robbery with a firearm, the jury signaled that it "believed at least some of defendant's account of events or was not fully convinced by the State's evidence regarding a plan to commit robbery." *Id*. at 443–44.

Though it minimizes the jury's acquittal, the majority proves the very point it purports to rebut. Relying on Mr. Wilson's admissions to officers, the majority concludes that Monte did "not appear to have been a part of the arrangements between defendant and Tink." Because the "conspiracy charge alleged a conspiracy between defendant and Monte," the majority continues, the jury's acquittal for that crime "does not inform whether defendant and Tink planned to rob Finch."

But for that logic to hold true, the jury *must* have believed at least some of Mr. Wilson's words. Indeed, the majority cites Mr. Wilson's statements as the sole evidence "tend[ing] to show that Monte was not part of any arrangement with defendant and/or Tink." If jurors believed Mr. Wilson when he disclaimed a conspiracy, then it is more likely that they believed him when he disputed his specific intent to commit an attempted armed robbery. Given jurors' skepticism on the conspiracy count, they may well have reached a different verdict on the murder

charge had they received different instructions.[4]

For that reason, this case raises the due process concerns that have long animated our precedent. Beyond question, the evidence "points to some criminal culpability" on Mr. Wilson's part. *Thomas*, 325 N.C. at 599. Even so, his specific intent—the key element of the predicate felony—"remains in doubt." *Beck*, 447 U.S. at 634. And viewed in Mr. Wilson's favor, the evidence is "in conflict" on whether he "purposely resolve[d]" or "actually intend[ed]" to rob Mr. Finch or help Tink do so. *See Jones,* 353 N.C. at 167–68.

But despite that conflict, the trial court declined to instruct jurors on second-degree murder, leaving them with just two options—to convict Mr. Wilson or acquit him entirely. *See Beck,* 447 U.S. at 634. That binary, we have explained, creates an impermissible "risk of an unwarranted conviction." *Conaway*, 339 N.C. at 514. Left with no other choices, jurors may have felt "compelled to convict" for "*some* offense in light of the gravity of the accused's admitted transgressions." *Brichikov,* 383 N.C. at

---

[4] In brushing aside the conspiracy acquittal, the majority also underscores the unfairness of a rule that bars defendants from offering their words to show a conflict in the evidence. According to the majority, the "evidence tended to show that Monte was not part of any arrangement with defendant and/or Tink." That "evidence": Mr. Wilson's statements to officers that Monte—his alleged co-conspirator—was "never part of the arrangement" and "coincidentally was in the area [of the crime] at this time." In other words, the majority offers Mr. Wilson's words as evidence that "tended to show" the lack of a conspiracy. Likewise, the majority points to Mr. Wilson's statements as evidence that he committed first-degree felony murder.

But when Mr. Wilson offers those same statements to question his intent, the majority's rule would have us close our eyes and cover our ears. In my view, if Mr. Wilson's words are competent evidence to support the State's case and exculpate Monte from a conspiracy, then they are competent evidence to dispute Mr. Wilson's specific intent to commit first-degree murder.

557. In this case, a second-degree murder instruction would have offered "a less drastic alternative," affording Mr. Wilson "the full benefit of the reasonable-doubt standard" and allowing jurors to select a verdict from the full menu of criminal offenses. *See Beck,* 447 U.S. at 633–34. By denying Mr. Wilson that instruction, the trial court below—and the majority today—withholds a key "procedural safeguard" and blesses a dangerously unreliable verdict. *See id.* at 637.

Because I would vacate Mr. Wilson's conviction and remand his case for full and fair proceedings, I respectfully dissent.

Justice RIGGS joins in this dissenting opinion.